# United States Court of Appeals for the Federal Circuit

2008-1154
(Cancellation No. 92/032,520)

AYCOCK ENGINEERING, INC.,

Appellant,

v.

AIRFLITE, INC.,

Appellee.

Rebecca E. Crandall, Coats & Bennett, PLLC, of Cary, North Carolina, argued for appellant. With her on the brief was Anthony J. Biller.

David J. Kera, Oblon, Spivak, McClelland, Maier, & Neustadt, P.C., of Alexandria, Virginia, argued for appellee.

Appealed from: United States Patent and Trademark Office
Trademark Trial and Appeal Board.

# United States Court of Appeals for the Federal Circuit

2008-1154
(Cancellation No. 92/032,520)

AYCOCK ENGINEERING, INC.,

Appellant,

v.

AIRFLITE, INC.,

Appellee.

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Canc. No. 92/032,520.

_____

DECIDED: March 30, 2009

_____

Before NEWMAN and LINN, <u>Circuit Judges</u>, and O'GRADY, <u>District Judge</u>.[*]

Opinion for the court filed by <u>District Judge</u> O'GRADY. Dissenting opinion filed by <u>Circuit Judge</u> NEWMAN.

O'GRADY, <u>District Judge</u>.

In 1970, Respondent-Appellant Aycock Engineering, Inc. ("Aycock Engineering") applied for a service mark, which was registered at the United States Patent and Trademark Office ("USPTO") in 1974 after examination. In 2007, however, the USPTO Trademark Trial and Appeal Board ("TTAB") declared the registration void because it failed to meet the "use in commerce" element of the Lanham Act. Aycock Engineering now appeals the TTAB's ruling. The question presented herein is whether the use in

_____

[*] Honorable Liam O'Grady, District Judge, United States District Court for the Eastern District of Virginia, sitting by designation.

commerce requirement is met when an applicant uses a service mark in the preparatory stages of a service's development, but never offers the service to the public. We hold that it is not.

## I. BACKGROUND[1]

In the late 1940s, William Aycock conceived of and began work on a service involving chartering flights in the air taxi industry. At that time, the common practice for air taxi companies was to lease entire airplanes, not individual seats. Consequently, individual passengers not belonging to a larger party faced more difficulty and expense in chartering a flight. Mr. Aycock intended, through his service, to allow solo passengers to arrange flights on chartered aircraft for less cost.

Mr. Aycock did not plan on operating the chartered air taxi services himself. Instead, his goal was to develop a system where he would serve his customers by acting as the middleman, or "communication link," between the customer and one of the air taxi service operators he contracted with to provide flights on an individual seat basis. Mr. Aycock planned to advertise his service, which he called the AIRFLITE service, to the public and to have those interested in using the service call a toll-free phone number to schedule reservations. After learning of customers' travel plans, Mr. Aycock would then arrange for the air taxi service to fly his customers with similar travel plans to their destinations. Mr. Aycock believed that in order for his service to become operational, he needed at least 300 air taxi operators in the United States to agree to participate in his air-taxi-operator network.[2]

---

[1] The following facts are undisputed unless noted herein.

In the years after conceiving of the idea for his service, Mr. Aycock worked toward offering the service to the public. In the mid-1960s, he formed Aycock Engineering—the corporate entity under which his service would operate. He also sought and obtained two toll-free telephone numbers that the public could use to make reservations. In March of 1970, Mr. Aycock invited virtually all air taxi operators certified by the Federal Aviation Administration ("FAA") to join his operation by, inter alia, distributing flyers with in-depth information about his AIRFLITE service. He eventually entered into contracts with some of those air taxi service operators.[3] Under these contracts, air taxi operators agreed to participate in the AIRFLITE service and even paid modest initiation fees to Mr. Aycock. Furthermore, Mr. Aycock filed a service mark application on August 10, 1970 for the term AIRFLITE, which was a term he had included in his advertisements.

Despite his efforts, Mr. Aycock's operation never got off the ground. While he estimated that he needed at least 300 air service operators under contract to make his service operational, Mr. Aycock never had more than twelve (4% of his minimum goal) under contract at any time throughout his company's history. And while Mr. Aycock advertised to air taxi operators, he never marketed the AIRFLITE service to the general public. More specifically, the record does not suggest that Mr. Aycock ever gave the public an opportunity to use the toll-free phone numbers to book reservations, or that he ever spoke with a member of the general public about making a reservation. Finally,

---

[2] Mr. Aycock stated in his deposition, "We start this when 300 air taxi operators in the United States have signed on to provide the transportation." J.A. 1942.

[3] Some of the contracts originated in the 1970s, and some came as late as 2001.

and most notably, Mr. Aycock never arranged for a single passenger to fly on a chartered flight.[4]

Mr. Aycock's AIRFLITE mark, which he applied for on August 10, 1970, was registered by the USPTO on April 30, 1974 on the Supplemental Register after a prosecution that involved considerable negotiation between Mr. Aycock and the trademark examining attorney. During the prosecution process, Mr. Aycock made several representations about his service. Mr. Aycock stated that "[t]his service is a communication service between persons desiring to charter aircraft and certified air taxi operators." J.A. 736. Mr. Aycock also represented that his "primary service is putting individuals desiring air transportation in contact with people rendering this service," and that he "does not himself transport but only places the parties in contact with each other." Id. at 749. The recitation of services for the AIRFLITE service mark eventually agreed upon by the USPTO and Mr. Aycock was "[a]rranging for individual reservations for flights on airplanes." Id. at 729. Mr. Aycock's application to renew his AIRFLITE service mark was granted by the USPTO on April 27, 1994.

In 2001, Airflite, Inc., the Petitioner-Appellee, filed a petition for cancellation alleging, inter alia, that Aycock Engineering did not use its AIRFLITE mark prior to registration in connection with the services identified in its registration. In that proceeding, the TTAB agreed with Airflite, Inc. and cancelled the AIRFLITE registration, finding that Mr. Aycock failed to render the service described in its registration in

---

[4] When asked at his deposition whether he had ever arranged for an individual to fly on an airplane, Mr. Aycock stated, "I had never made a—any arrangement . . . I had never had a talk with the customer then talked with the air taxi operator and reached any agreement on them carrying the customer." J.A. 858.

commerce. Airflite, Inc. v. Aycock Eng'g, Inc., Cancellation 92032520, 2007 WL 2972237, at *7 (TTAB Oct. 4, 2007) ("TTAB Decision").[5]

## II.  DISCUSSION

### A.  Jurisdiction

Aycock Engineering timely filed its appeal under 15 U.S.C. § 1071 (2006), which permits both an applicant for registration of a mark and a party to a cancellation proceeding to appeal decisions of the TTAB to this Court.  Jurisdiction arises under 28 U.S.C. § 1295(a)(4)(B) (2006), which authorizes the Court to hear appeals of TTAB decisions filed under 15 U.S.C. § 1071.

### B.  Standard of Review

We review the TTAB's legal conclusions de novo. In re Pacer Tech., 338 F.3d 1348, 1349 (Fed. Cir. 2003) (citing In re Int'l Flavors & Fragrances Inc., 183 F.3d 1361, 1365 (Fed. Cir. 1999)).  The TTAB's factual findings are reviewed for substantial evidence.  Id. (citing On-Line Careline, Inc. v. Am. Online, Inc., 229 F.3d 1080, 1085 (Fed. Cir. 2000)).  "Substantial evidence is 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." Id. (citing Consol. Edison v. NLRB, 305 U.S. 197, 229 (1938)).

---

[5]  Because it cancelled the AIRFLITE mark on use requirement grounds, the TTAB declined to decide the other issues before it, which were priority of use and likelihood of confusion, fraud, and abandonment.  In this appeal, we only consider the issue of whether the use requirement is met.  We do not consider the issues that the TTAB declined to address.

As our colleague notes, the TTAB also addressed the issue of whether the activity described in the registration description qualifies as a registrable service.  We decline to address this issue, however, because our decision today rests independently on use requirement grounds.

C. Interpretation of the Recitation of Services in Mr. Aycock's Service Mark Application

A prerequisite to deciding the use requirement issue, discussed infra, involves defining the recitation of services in the application.[6] Mr. Aycock's registration describes the services rendered under the mark as "arranging for individual reservations for flights on airplanes." TTAB Decision, 2007 WL 2972237, at 2. The TTAB concluded that the scope of this description was "limited to regulating, coordinating, operating, or administering a system to book flights on airplanes," which required more than arranging the network of air taxi operators. Id. at *6. Mr. Aycock argues that the TTAB's construction of the services in the registration was erroneous, and that the record, including the prosecution history, supports a construction that permits the mere arranging of a network of air taxi operators by itself to constitute the service. Airflite counters that the TTAB correctly construed the services at issue.

We agree with the TTAB that the service described in Mr. Aycock's registration is arranging for the transportation of a person from one place to another or providing a communication service between a person desiring custom air travel and an air taxi operator, and that this entails more than the arranging of the network of air taxi operators. During prosecution, Mr. Aycock repeatedly emphasized that his service was the arrangement for transportation between a person and an air taxi service on a per seat basis. For example, early in the prosecution he described the services behind the mark for which he sought registration as "a communication service between persons

---

[6] Registration must be examined based on the identification description. See In re Shell Oil Co., 992 F.2d 1204, 1207-08 (Fed. Cir. 1993); Octocom Sys. Inc. v. Houston Computer Servs. Inc., 918 F.2d 937, 942 (Fed. Cir. 1990).

desiring to charter aircraft and certified air taxi operators." J.A. 736. Mr. Aycock later explained: "Applicant's primary service is putting individuals desiring air transportation in contact with people rendering this service. Applicant does not himself transport but only places the parties in contact with each other." Id. at 749. In the final amendment before the registration was allowed on the Supplemental Register, Mr. Aycock stated:

> It should again be emphasized that the service rendered by Applicant is not a service of arranging charter aircraft but rather is the arrangement of transportation on a per seat basis from one point to another, with the local aircraft operator, under his own trademark whatever it may be, to actually do the flying. In other words, the mark "Airflite" would not be descriptive of a ticket sales organization and this, in effect, is what Applicant's service is all about.

Id. at 745. These representations to the examiner make clear that "arranging for individual reservations for flights on airplanes" means just that, and includes more than Mr. Aycock's preparatory efforts to arrange a network of air taxi operators. Notably, Mr. Aycock's contracts with the air taxi operators reinforce that the nature of his service was the arranging of flights for persons desiring air taxi service, not merely the creation of a network to do so. Id. at 448 ("AIRFLITE personnel will be on duty at all times and hours of the day for the purpose of arranging air transportation for the traveling public . . . ."); id. at 454 ("AYCOCK will operate suitable facilities and equipment to maintain a constant knowledge of all reservations and flights, and personnel will be on duty at all times to arrange AIRFLITE air transportation for Customers with OPERATOR. AYCOCK will use its best efforts to find and group Customers, timewise and directionwise just as scheduled airlines do, so as to put together profitable payloads going both ways that the OPERATOR can carry."). Thus, we affirm the TTAB's

determination that the scope of the services defined in the registration requires the arranging of flights between an air taxi operator and a passenger.[7]

Mr. Aycock also argues that "law of the case" precludes the TTAB's determination. At the summary judgment stage of the proceedings below, the TTAB concluded that the recitation of services "may be broad enough to encompass both the services [Mr. Aycock] contends that it provides as well as those [Airflite] asserts it has never provided." J.A. 289. Thus, according to Mr. Aycock, this determination on summary judgment precluded the TTAB from later construing the registration description to mean that merely arranging the network of air taxi operators by itself was insufficient to constitute the service. Mr. Aycock misunderstands the law of the case doctrine, which simply does not apply to a denial of summary judgment. E.g., Bethlehem Steel Exp. Corp. v. Redondo Constr. Corp., 140 F.3d 319, 321 (1st Cir. 1998). In any event, assuming for the sake of argument that a denial of summary judgment could invoke law of the case, the TTAB's determination on summary judgment that Mr. Aycock's registration "may be broad enough" to include certain services does not foreclose the TTAB from determining, based upon the entire record (including trial, briefing, and oral argument), what the registration actually covers.

Thus, we conclude that the TTAB correctly construed the scope of Mr. Aycock's registration to require more than the arranging of the network of air taxi operators.

---

[7] We respectfully disagree with our esteemed colleague's interpretation of the recitation of services found in her dissent. We believe that the communications between Mr. Aycock and the trademark examining attorney show that Mr. Aycock's service required some contact between a potential customer desiring to reserve a seat on a chartered flight and his company. Therefore, it is our view that the definition of the recitation of services required offering the service to a potential customer.

## D. Use Requirement

Under § 45 of the Lanham Act, a service mark is any "word, name, symbol or device, or any combination thereof used by a person, or which a person has a bona fide intention to use in commerce . . . to identify and distinguish the services of one person . . . from the services of others." 15 U.S.C. § 1127 (2006). The definition of "service mark" is virtually identical to the definition of "trademark." But while service marks apply to intangible services, trademarks are used to distinguish tangible goods. See id.; Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1156 (9th Cir. 2001); Lloyd's Food Prods., Inc. v. Eli's, Inc., 987 F.2d 766, 768 (Fed. Cir. 1993).

"It is clear from the wording of the Lanham Act that applications for service mark registrations are subject to the same statutory criteria as are trademarks." 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 19:82 (4th ed. 2008) [hereinafter McCarthy]; see 15 U.S.C. § 1053 (2006). One such statutory criterion that applies to both trademarks and service marks is the "use in commerce" requirement. For trademarks, the "use in commerce" requirement is met when a mark is (1) placed on the good or container, or on documents associated with the goods if the nature of the goods makes placement on the good or container impracticable, and (2) that good is then "sold or transported in commerce." 15 U.S.C. § 1127 (2006). For service marks, the "use in commerce" requirement is met when (1) a mark is "used or displayed in the sale or advertising of services" and (2) either (i) the services are "rendered in commerce" or (ii) the services are "rendered in more than one State or in the United States and a foreign country and the person rendering those services is engaged in

commerce in connection with the services."[8]  Id.  The registration of a mark that does not meet the use requirement is void ab initio.[9]  See Gay Toys, Inc. v. McDonald's Corp., 585 F.2d 1067, 1068 (CCPA 1978); 3 McCarthy § 19:112.

Despite the seeming harmony and simplicity in the application of the use requirement to trademarks and service marks, opportunity exists for confusion in this area of the law.  Different statutory requirements apply to applications filed before November 16, 1989, as compared to those filed after.  This is because in 1988, Congress passed the Trademark Law Revision Act ("TLRA").  The TLRA altered the burden that applicants must meet before satisfying the use element by requiring an applicant to make a "bona fide use of [the] mark in the ordinary course of trade." Trademark Law Revision Act of 1988, Pub. L. No. 100-667, 102 Stat. 3935 (effective November 16, 1989) (codified at 15 U.S.C. § 1127 (2006)).

This "bona fide use" language was intended to eliminate "token uses," which occurred when applicants used marks in conjunction with selling goods or offering services for the sole purpose of obtaining registration, and with no intention of legitimately using the mark in commerce until a later date.  See Blue Bell, Inc. v. Jaymar-Ruby, Inc., 497 F.2d 433, 437 (2d Cir. 1974).  Before 1989, a "token use" was sufficient to satisfy the use requirement and qualify a mark for registration.  See id.

---

[8]  "Although [element 2(ii) of the service mark use requirement] was added in 1962 with the intention of expanding the coverage, it has turned out that [element 2(i)] has provided the basis for the broadest interpretation of use in commerce."  3 McCarthy § 19:103 (internal citations omitted).  "In light of subsequent decisions, the 1962 addition turned out to be more restrictive than the older 'rendered in commerce' phrase."  Id.

[9]  "Void ab initio" means "[n]ull from the beginning."  Black's Law Dictionary 1064 (8th ed. 2004).

In addition to eliminating token uses, the 1988 TLRA made other changes to the use requirement.  Before 1989, an applicant only qualified for registration if he was using his mark in commerce at the time he filed his application at the USPTO. WarnerVision Entm't Inc., v. Empire of Carolina, Inc., 101 F.3d 259, 260 (2d Cir. 1996). But after 1989, an applicant could begin the registration process even when his mark was not in use in commerce at the time of the filing, so long as he had a "bona fide intention to use the mark in commerce" at a later date.  15 U.S.C. § 1051(b) (2006). Applicants filing these "intent to use" applications are only granted registration, however, if they file a verified statement of commercial use proving eventual use of the mark in commerce.  Id. § 1051(d).[10]

Because the mark at issue here is a service mark, the use requirement relating to service mark applications, as opposed to trademark applications, guides our analysis. Furthermore, the application at issue in this case was filed in 1970.  Therefore, this case must be decided according to the service mark use requirement that appeared in the Lanham Act in 1970 (i.e., the pre-1989 version).  See 3 McCarthy § 19:112.  However, for the reasons stated below, our holding in this case also applies to the current (and post-1989) service mark use requirement.

---

[10]    The exception to this rule, which applies to foreign applicants, provides that

> [a] mark duly registered in the country of origin of the foreign applicant may be registered on the principal register if eligible, otherwise on the supplemental register in this chapter provided . . . . The application must state the applicant's bona fide intention to use the mark in commerce, but use in commerce shall not be required prior to registration.

15 U.S.C. § 1126(e) (2006).

E.  Use Requirement for Service Marks

With the exception of the 1988 TLRA statutory language eliminating token uses and permitting intent-to-use applications, the service mark use requirement as it appeared in 1970 is materially identical to the post-1989 version.  The use provision of the Lanham Act in force in 1970 stated that a service mark was in use in commerce "when it is used or displayed in the sale or advertising of services, and the services are rendered in commerce, or the services are rendered in more than one State or in this and a foreign country and the person rendering the services is engaged in commerce in connection therewith."  Pub. L. No. 87-772, 76 Stat. 769 (1962).  Therefore, like the current use requirement, a service mark applicant seeking to meet the pre-1989 version had to (1) use the mark in the sale or advertising of a service and (2) show that the service was either rendered in interstate commerce or rendered in more than one state or in this and a foreign country by a person engaged in commerce.

Courts, as well as the TTAB, have interpreted the pre-1989 statutory language in analogous cases.  Without question, advertising or publicizing a service that the applicant intends to perform in the future will not support registration.  In re Cedar Point, Inc., 220 USPQ 533, 536 (TTAB 1983) (quoting Intermed Commc'ns, Inc. v. Chaney, 197 USPQ 501, 507-08 (TTAB 1977)); Greyhound Corp. v. Armour Life Ins. Co., 214 USPQ 473, 474 (TTAB 1982).  Instead, the advertising or publicizing must relate to "an existing service which has already been offered to the public."  Greyhound, 214 USPQ at 474.  Furthermore, "[m]ere adoption (selection) of a mark accompanied by preparations to begin its use are insufficient . . . for claiming ownership of and applying

to register the mark." Intermed, 197 USPQ at 507; see Blue Bell, 497 F.2d at 437. "At the very least," in order for an applicant to meet the use requirement, "there must be an open and notorious public offering of the services to those for whom the services are intended." Intermed, 197 USPQ at 507.

In Intermed, the TTAB rejected a service mark application for failing to meet the use in commerce requirement even where the applicant had performed many pre-application service-oriented activities involving the public. Id. at 508-09. The applicant in that case sought to register a mark intended to identify an international medical services operation. Id. at 502. The applicant's plan was to build the international service from an already operating United States-based medical service. Id. at 503. The applicant intended to, and did use the United States-based operation as a fundraising affiliate of the new international operation. Id. at 504. Additionally, the applicant communicated with and solicited the support of the Iranian government regarding the service before the application was filed. Id. The applicant also issued a detailed announcement using the service mark term before the filing date designed to inform and update individuals about the service's status. Id. Finally, and also before the date of application, the applicant hired a fundraising firm to raise money for the service. Id. at 508.

Despite these activities, the TTAB held that the applicant failed to meet the use requirement because the services described in the application were not "offered, promoted, advertised or rendered . . . in commerce." Intermed, 197 USPQ at 504. The TTAB stated that "[t]he statute requires not only the display of the mark in the sale or advertising of services but also the rendition of those services in order to constitute use

of the service mark in commerce." Id. At 507-08. The TTAB further explained that adopting a mark accompanied by mere "preparations to begin its use" is insufficient for service mark registration, and that in order for the use requirement to be met, there must be "an open and notorious public offering of the services to those for whom the services are intended." Id. at 507.

In 1983, the TTAB again rejected a service mark application because it failed to meet the use requirement. Cedar Point, 220 USPQ at 533. In Cedar Point, the Cedar Point amusement park, which had been in business for decades, was preparing to open a new water park addition in mid-May of 1980. Id. at 535. One preparatory step taken by Cedar Point before opening day was the filing of a service mark application to register the mark "OCEANA" for its new water park service. Id. Cedar Point also distributed nearly 700,000 water park advertisement brochures containing the OCEANA mark during the months preceding the grand opening. Id.

The TTAB emphasized the fact that Cedar Point filed its service mark application with the USPTO before it opened the water park's doors and offered those services to the public. Id. at 535-36. The TTAB then explained that the use of a mark in connection with the advertising of services intended to be "available at some time in the future, but not yet available at the time of filing" does not qualify the mark for registration. Id. at 535. Therefore, Cedar Point's water park advertising campaign, which was ongoing at the time the application was filed, was insufficient on its own to support registration. Id. As a result, the TTAB held that the "applicant's mark 'OCEANA' was not in 'use in commerce' . . . at the time of the filing of [the] application" and that the application was thus void ab initio. Id. at 537.

Interestingly, Cedar Point filed for its service mark roughly one month before the scheduled opening of the new water park. Id. at 535. With the application date being so close to the opening date, it is indisputable that Cedar Point had taken numerous steps toward constructing the water park by the time the application was filed. Nevertheless, the TTAB found none of these preparatory steps sufficient to satisfy the use in commerce requirement.

The TTAB also addressed the use in commerce issue in the 1982 Greyhound case. Greyhound, 214 USPQ at 473. In that case, the applicant, a life insurance company, filed a service mark application in November of 1979. Id. at 474. Before the filing date, the applicant advertised its services by disseminating informational letters and posters using the service mark. Id. Despite this activity, the TTAB held that the service described in the application was not rendered in commerce and thus declared the application void ab initio. Id. at 475. The TTAB explained that "it is well settled that advertising of a service, without performance of a service, will not support registration . . . . The use in advertising which creates a right in a service mark must be advertising which relates to an existing service which has already been offered to the public." Id. at 474.

We find the reasoning of these cases persuasive. The language of the statute, by requiring that the mark be "used or displayed in the sale or advertising of services, and the services are rendered in commerce," makes plain that advertisement and actual use of the mark in commerce are required; mere preparations to use that mark sometime in the future will not do. Thus, we hold that an applicant's preparations to use a mark in commerce are insufficient to constitute use in commerce. Rather, the mark

must be actually used in conjunction with the services described in the application for the mark.

## F.  Analysis

As explained above, Mr. Aycock's AIRFLITE service mark application can only meet the use requirement if (1) his AIRFLITE mark was "used or displayed in the sale or advertising of services," and (2) his AIRFLITE service was either "rendered in commerce" or rendered in more than one state or in this and a foreign country by a person engaged in commerce.  15 U.S.C. § 1127 (2006).  Because our determination under the second element is dispositive, we will not address the issue of whether Mr. Aycock's advertising was sufficient to meet the first element of the service mark use requirement.

In order to decide whether the second element is met, we must determine whether Mr. Aycock ever gave an intended customer the opportunity to use his AIRFLITE service.  In other words, we must determine if Mr. Aycock made an open and notorious rendering, or offering, of his service to the public.  See Intermed, 197 USPQ at 507.  Upon review, we conclude that the TTAB's determination that Mr. Aycock failed to offer his service to the public is supported by substantial evidence, because he never gave anyone an opportunity to use his AIRFLITE service to make a charter flight reservation.  Instead, Mr. Aycock merely took sporadic steps in preparing to offer his service to the public.

Specifically, Mr. Aycock formed Aycock Engineering, which was the corporate entity under which he intended to operate his AIRFLITE service.  He also obtained two toll-free telephone numbers that he planned to provide for potential customers seeking

to make flight reservations. The most notable step Mr. Aycock took toward offering his AIRFLITE service to the public came when he contracted with the air taxi operators. Under these contracts, air taxi operators agreed to participate in the AIRFLITE air taxi network by being available to provide flights for customers using the AIRFLITE service. These operators even paid modest initiation fees to Aycock in order to participate in the service.

But these activities, even taken together, do not constitute a service that falls within the scope of our definition of the recitation of services. As mentioned earlier, it is our view that the service described in Mr. Aycock's service mark application covers only the arranging of flights between an air taxi operator and a passenger, and not preparatory efforts to arrange a network of air taxi operators. The activities described above, however, were merely preparatory steps that Mr. Aycock took toward his goal of one day, as he described, operating a "communication service between persons desiring to charter aircraft" that "put[] individuals desiring air transportation in contact with people rendering that service." J.A. 736, 749.

In order for Mr. Aycock to satisfy the use requirement, more was required. Mr. Aycock had to develop his company to the point where he made an open and notorious public offering of his AIRFLITE service to intended customers. See Intermed, 197 USPQ at 507. However, at no point in time did Mr. Aycock give a potential customer the chance to use his AIRFLITE service. He never arranged for a single flight between a customer and an air taxi operator. This is because Mr. Aycock, as stated in his deposition, believed he needed at least 300 air taxi operators under contract before his service could become operational. Reasonably, because he never had more than

twelve air taxi operators under contract at any one time, Mr. Aycock chose not to open his doors to the public.

Furthermore, while the two toll-free telephone numbers he obtained could have been used at some point in time as a means of offering the service to the public, they were never actually used for this purpose. Nothing in the record suggests that Mr. Aycock ever gave potential customers an opportunity to use the phone lines to make flight reservations, or that a single customer seeking to book a flight actually called the toll-free number. The record also fails to indicate that Mr. Aycock, or anyone else associated with Aycock Engineering ever spoke with a member of the general public about making a flight reservation through the AIRFLITE service.

That Mr. Aycock advertised to, contracted with, and was paid by air taxi operators does not transform the service from its preparatory stages to being rendered in commerce. Instead, these actions were Mr. Aycock's attempts to build the service's infrastructure, which, when completed, could then be offered to the public (and thus "rendered in commerce").

Notably, Mr. Aycock set the goal of obtaining 300 air taxi operators by himself. He had the option of attempting to run his AIRFLITE service with the air taxi operators he had under contract when he applied for his service mark in 1970. Even though this approach likely would have led to a much smaller and less profitable operation than he originally intended, he could have met the use requirement had he taken this route.[11]

_____

[11] The success or profitability of the service once it is offered to the public is irrelevant in the use requirement analysis. Therefore, the use requirement can be met when a service that was open for business immediately fails. This reasoning does not apply, however, to services that failed during their preparatory stages and, as a result, were never offered to the public. The use requirement is not met in such instances.

Even more, because Mr. Aycock filed his service mark application before 1989, he had the "token use" option at his disposal. But he does not argue, and the facts do not show, that he ever attempted to make a token use of his AIRFLITE service.

In sum, the activities that Mr. Aycock performed throughout the process of building his AIRFLITE service at no point in time amounted to a rendering in commerce of the service described in his application. In addition, the service was never rendered in more than one state or in this and a foreign country by a person engaged in commerce. Therefore, we hold that Mr. Aycock's AIRFLITE service mark application did not meet the use requirement when he filed it in 1970 and is thus void ab initio.[12] Further, Mr. Aycock failed to meet the use requirement during any of his additional dealings with the USPTO that took place after 1970, including his 1994 renewal application.[13]

## III. CONCLUSION

For these reasons, Aycock Engineering's AIRFLITE service mark application failed to meet the use requirement. Accordingly, the final decision of the TTAB cancelling the registration of the AIRFLITE mark is <u>affirmed</u>.

---

[12] We find it unfortunate that Mr. Aycock lost his AIRFLITE service mark after the USPTO granted him a registration over thirty years ago. But under the federal trademark and service mark registration system, no period of years exists beyond which a mark holder becomes immune from invalidation under the use requirement. This harsh reality may be offset by the common-law trademark doctrine, which provides a mark user with rights even if that user did not file an application with the USPTO.

[13] While the 1988 TLRA changed the use requirement registration procedures by permitting "intent to use" applications, the applicant must still use the mark in commerce at some point in time after that intent to use application is filed in order to qualify for registration. See 15 U.S.C. § 1051(b), (d) (2006). Because Mr. Aycock never used his service mark at any point in time in commerce, he would not have met the use requirement in 1994, which was the year his renewal application was granted.

AFFIRMED

# United States Court of Appeals for the Federal Circuit

2008-1154
(Cancellation No. 92/032,520)

AYCOCK ENGINEERING, INC.,

Appellant,

v.

AIRFLITE, INC.,

Appellee.

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Canc. No. 92/032,520.

NEWMAN, Circuit Judge, dissenting.

Now, thirty-five years after federal registration of the service mark AIRFLITE and thirty-nine years after Aycock's first use of the service mark AIRFLITE, without any objection or opposition to the registration in 1974 or its renewal in 1994, it is inappropriate for the PTO to criticize its own description of the services and on this ground to invalidate the registration as void when granted. The Trademark Trial and Appeal Board (TTAB) considered no question of prior use, or confusion, or deception, or any other substantive ground of invalidity. This registration was unchallenged for decades, until an apparent later user, who selected the same word "Airflite" as its trade name for a different business,

brought this cancellation proceeding. The TTAB erred in reaching out to void this registration on the questionable grounds that it adopted.

## DISCUSSION

The TTAB found a flaw in the description of the services in the registration of the mark AIRFLITE. The TTAB then redescribed the services, and found that the mark was not used for the services as they were redescribed by the TTAB. However, the AIRFLITE services when the mark was registered in 1974 were the same services as described during prosecution of the application, the same services as when the Section 8 affidavit was filed in 1980, the same services as when the registration was renewed in 1994. The description in the registration, when finally granted after movement to the Supplemental Register, was not perfect, but neither was it incorrect. The Board errs in now interpreting the description as excluding the very services that were the basis of the registration. The services for which the mark was registered were described during the examination, shown in the specimens submitted with the application, and reasonably reflected in the description that the examiner required. If indeed a flaw in the registration is now discovered, after thirty-five years, it should be clarified and corrected, not voided ab initio. The cancellation of this long-standing registration is seriously flawed, and is seriously unjust.

### A

The ground on which the Board founded its decision was not raised by the petitioner, and is not only incorrect but also was improperly considered by the Board. The Board held that AIRFLITE was not a registrable service mark because Aycock was using the mark to recruit air taxi operators, the Board ruling that this use did not constitute a registrable service. This issue was not raised in the cancellation proceeding, was not briefed by either

2008-1154 2

party, and was not properly before the Board. The cancellation petitioner itself points out this error, in its brief to this court:

> The question of whether the activity of recruiting air taxi operators and signing them to contracts to carry passengers in accordance with reservations arranged through Aycock was a service for which a service mark would be registrable was not pleaded or tried at the Trademark Trial and Appeal Board.

Appellee Br. 13-14. The Trademark Board Manual of Procedure, at §314, prohibits reliance by the Board on an unpleaded issue in cancellation proceedings, for the registrant is entitled to know the grounds to which it must respond. Yet this prohibited procedure underlies the Board's decision voiding Aycock's registration.

Having improperly considered this ground, the Board further erred by ruling that Aycock's AIRFLITE service does not meet the requirement that a registrable service "must be performed to the order [of], or for the benefit of, someone other than the applicant." Airflight, Inc. v. Aycock Eng'g, Inc., Cancellation No. 92/032,520, 2007 WL 2972237, at *5 (TTAB 2007) (quoting Trademark Manual of Examining Procedure (T.M.E.P.) §1301.01(a)). The Board ruled that only benefit to air passengers could support registration of AIRFLITE, and found that without sales to passengers, Aycock's ongoing activity of forming a network of air taxi operators benefited only Aycock. This finding is clearly incorrect, for the air taxi operators who entered into contracts with Aycock, paying a fee, obviously had their own benefit in mind.

After improperly ruling that the service of providing a network of air taxi operators cannot support a registrable service mark, the Board held that the description of services in the AIRFLITE registration requires the booking of flights in airplanes. The TTAB held that since no individuals had booked flights in Aycock's network, Aycock was not performing the

service described in the registration, and cancelled the registration. My colleagues on this panel appear to agree with the Board that the registration requires the transportation of passengers, and thereby define the registration into invalidity. However, the Lanham Act was designed to support the marks of commerce. See, e.g., In re Adver. & Mktg. Dev., Inc., 821 F.2d 614, 618 (Fed. Cir. 1987) (quoting Am. Int'l Reinsurance Co. v. Airco, Inc., 570 F.2d 941, 943 (CCPA 1978)) (in the Lanham Act "the term 'services' was intended to have broad scope" and "no attempt was made to define 'services' simply because of the plethora of services that the human mind is capable of conceiving"). The definition should be construed to support the registration, when it is reasonable to do so.

In addition to its irregular procedure, the Board is incorrect in substance, for the service of recruiting air taxi operators and contracting with them is indeed a registrable service. It is not disputed that this activity was performed in commerce, and accorded with the service mark statute as then written (and today is substantially the same):

> For purposes of this Act a mark shall be deemed to be used in commerce . . . (b) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in this and a foreign country and the person rendering the services is engaged in commerce in connection therewith.

15 U.S.C. §1127 (1970). The specimens filed with the application show display of the mark AIRFLITE in Aycock's advertising of its services to air taxi operators nationwide, and the record states that Aycock obtained contracts with about a dozen air taxi operators. Mr. Aycock testified that this is far fewer than the number that he needs, and that the business has not progressed as he had hoped. However, there was no finding of discontinuance or abandonment of the activity. Slow commercial progress, or absence of income or profit, is not a ground of cancellation of registration. See generally United We Stand Am., Inc. v.

<u>United We Stand, Am. N.Y., Inc.</u>, 128 F.3d 86, 92 (2d Cir. 1997) (use in commerce under the Lanham Act is not limited to profit-seeking uses). The Lanham Act authorizes cancellation of abandoned marks, but a mark is not abandoned because the proprietor is encountering difficulties in the business.

The Board relied on TTAB decisions relating to services not yet rendered, to support the Board's position that Aycock had not used AIRFLITE in commerce. For example, in <u>In re Cedar Point, Inc.</u>, 220 USPQ 533 (TTAB 1983), the applicant was found not to have used the mark OCEANA for a "marine entertainment park" because the park had not yet opened, and the Board held that advance publicity was not use in commerce. However, Aycock had used AIRFLITE to implement the network of air taxi carriers; Aycock was not engaging in advance publicity, but was performing the registered service, for Aycock made "an open and notorious public offering of the services to those for whom the services are intended." <u>Intermed Commcn's, Inc. v. Chaney</u>, 197 USPQ 501, 507 (TTAB 1977).

**B**

The prosecution history shows the genesis of the imperfect description in the registration. In the initial application filed on August 19, 1970, the AIRFLITE services were described as "a communication service between persons desiring custom air travel and certified air taxi operators," and the applicant requested registration in Class 101, "Advertising and Business." J.A. at 731. The specimens showed the mark AIRFLITE displayed in a document directed to air taxi operators, pointing out the advantages to the operators of the service provided by AIRFLITE and inviting their participation. The trademark examiner rejected the application on the ground that the word AIRFLITE was

"merely descriptive," objected to the description as indefinite, and suggested that the services be described as "airplane reservation services." J.A. at 735.

Aycock in response objected to the examiner's suggested description, and proposed "a communication service between persons desiring scheduled and unscheduled airplane reservation services and certified air taxi operators." J.A. at 736. The examiner rejected this proposal, stating, "The mere fact that applicant communicates with people does not mean that it offers a communication service." The examiner stated that the application should be amended to describe the service as "arranges charter air flights." The examiner also objected that the mark was "highly descriptive," and proposed reclassification into Class 105, "Transportation and Storage." J.A. at 741. Aycock responded that his service did not charter whole aircraft, but arranged for individual seat reservations on chartered flights, and offered to further amend the description to "a communication service between persons desiring scheduled and unscheduled airplane reservation services and certified air taxi operators in the locale in which the charter is desired to originate." The examiner rejected the offer, and issued a final refusal of registration. The examiner also maintained that Class 105 was the proper classification.

Aycock filed an appeal with the Trademark Trial and Appeal Board. Then, after discussion with the examiner, Aycock agreed to transfer the application to the Supplemental Register, and the TTAB remanded for further prosecution. Aycock again explained that the service with which the mark is used "is not a service of arranging charter aircraft but rather is the arrangement of transportation on a per seat basis from one point to another, with the local aircraft operator, under his own trademark whatever it may be, to actually do the flying." J.A. at 745. After fairly extensive further exchanges, Aycock

acquiesced in the final description "arranging for individual reservations for flights on airplanes" and also acquiesced in the reclassification into Class 105. This description, whose flaws are now apparent, was the basis of the Board's ruling that unless there were actual passenger reservations, the mark was not in use in commerce.

My colleagues agree. However, it is inappropriate now to construe the description of AIRFLITE services as excluding the integral component of making arrangements with air taxi operators. This was the use described in the specimens filed with the application, and was persistently, but fruitlessly, explained to the examiner throughout the prosecution. I do agree that the applicant as well as the examiner offered less than perfect definitions, over this lengthy prosecution. However, as a matter of sound trademark law and fair trademark practice, it is inappropriate now to construe the registration so as to exclude the actual use of the mark as was explained in the examination, shown in the specimens, and fully explored in the public record of the prosecution.

Few administrative proceedings are perfect, although in the hindsight bred of litigation much can be made of flaws. Here there is no material violation of law, no harmful error, no doubt as to the services for which registration was requested and granted. It is unfair to penalize the applicant for flaws for which there was at least a shared responsibility, for the trademark examiner does not appear to have scrupulously adhered to the requirement of the Trademark Manual of Examining Procedure §1402.01(a) ("Deference should be given to the language and the classification set forth by the applicant in the original application."). Precedent concerning the interpretation of imperfect descriptions is sparse, for if such issues arise, they can normally be remedied without litigation. The panel majority cites two cases that favor narrow construction of the description of services, In re

<u>Shell Oil Co.</u>, 992 F.2d 1204, 1207-08 (Fed. Cir. 1993), and <u>Octocom Systems, Inc. v. Houston Computer Services, Inc.</u>, 918 F.2d 937, 942 (Fed. Cir. 1990). Both of these cases relate to the effect of the description on likelihood of confusion between competing applicants—an issue unrelated to anything relevant to this appeal.

Based on its origin in the common law of trademarks, the Lanham Act has traditionally been applied to support the commercial activity that is implemented through the marks of trade, with liberal opportunity to correct errors. It is a negation of these principles now to hold that the AIRFLITE registration of thirty-five years was void from the start, because the applicant acquiesced in a prosecution description that is now susceptible to misconstruction. It is incorrect to construe the description in a manner that invalidates it by ignoring the actual services that were performed. I must, respectfully, dissent from this court's endorsement of the TTAB's departure from its obligation to sustain the registered marks of commerce when it is reasonable to do so.