# United States Court of Appeals
# for the Federal Circuit

_____

**SHEILA LYONS, DVM,**
*Appellant*

**v.**

**THE AMERICAN COLLEGE OF VETERINARY SPORTS MEDICINE AND REHABILITATION,**
*Appellee*

_____

2016-2055

_____

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 92053934.

_____

Decided: June 8, 2017

_____

STEPHEN J. LYONS, Klieman & Lyons, Boston, MA, argued for appellant.

DAVID A. KLUFT, Foley Hoag, LLP, Boston, MA, argued for appellee. Also represented by NICOLE KINSLEY.

_____

Before LOURIE, WALLACH, and STOLL, *Circuit Judges*.

LOURIE, *Circuit Judge.*

Sheila Lyons, DVM ("Lyons") appeals from a decision of the U.S. Patent and Trademark Office ("the PTO") Trademark Trial and Appeal Board ("the Board") cancelling her registration of the service mark THE AMERICAN COLLEGE OF VETERINARY SPORTS MEDICINE AND REHABILITATION ("the mark") on the Supplemental Register on the ground that she does not own the mark. *See Am. Coll. of Veterinary Sports Med. & Rehab. v. Lyons*, 2016 WL 1380739, at \*19 (T.T.A.B. Mar. 17, 2016) ("*Decision*"). For the reasons that follow, we affirm.

## BACKGROUND

Lyons is an equine veterinarian. In 1999, Lyons met Dr. Robert Gillette ("Gillette") at a conference where they discussed the prospect of forming a veterinary specialist organization ("VSO") for treating athletic animals. Gillette had published a similar proposal for board certification in canine medicine the previous year. For a VSO to become accredited by the American Veterinary Medical Association ("AVMA"), a group of veterinarians wishing to create the VSO must form an organizing committee and submit a letter of intent to the AVMA. Thus, between 1999 and 2002, Lyons, Gillette, and four other veterinarians formed an organizing committee, of which Gillette served as the chair. By at least as early as 2002, the committee began using the mark as the name of the intended VSO. In the winter of 2002, Lyons participated in drafting a letter of intent, which was later submitted to the AVMA, and worked with the organizing committee to create a petition to seek accreditation for its VSO. In early 2004, Lyons drafted proposed bylaws and articles of incorporation for the VSO, which she presented to the organizing committee. In July 2004, Lyons was dismissed from the organizing committee for reasons not relevant to this appeal.

Almost a year after her dismissal from the committee, Lyons sought registration of the mark on the Principal Register for "veterinary education services namely conducting classes, seminars, clinical seminars, conferences, workshops and internships and externships in veterinary sports medicine and veterinary rehabilitation" in International Class 41, based on her assertion of a bona fide intention to use the mark in commerce under 15 U.S.C. § 1051(b). *Decision*, 2016 WL 1380739, at *1. The PTO denied her application on the ground that the mark was geographically descriptive. In March 2006, Lyons therefore amended the application to seek registration on the Supplemental Register, based on actual use under 15 U.S.C. § 1091(a), alleging first use anywhere as of December 20, 1995 and first use in commerce at least as early as June 18, 1996. In May 2006, the PTO registered the mark on the Supplemental Register, Registration No. 3,088,963.

Meanwhile, the organizing committee, led by Dr. Gillette, had continued to work on the VSO petition for AVMA accreditation and submitted a first draft to the AVMA in November 2008. In 2009, the AVMA published the petition to its members in the *Journal of American Veterinary Medicine* and in its electronic newsletter. In 2010, the AVMA granted provisional recognition to the VSO, which was entitled the "American College of Veterinary Sports Medicine and Rehabilitation" ("the College") and incorporated as a Colorado non-profit organization in June 2011. The College administered its first certification test in 2012 and subsequently certified over 115 veterinarians in the specialty, established 13 active residency programs at veterinary colleges, and conducted annual meetings, conferences, and continuing education programs in collaboration with other AVMA-certified VSOs.

On April 25, 2011, the College petitioned to cancel Lyons's registration on the Supplemental Register on grounds of priority of use and likelihood of confusion

under 15 U.S.C. § 1052(d), misrepresentation of source under 15 U.S.C. § 1064, and fraud. The cancellation proceeding was suspended for almost three years during the pendency of a civil action between the parties in the U.S. District Court for the District of Massachusetts, where Lyons alleged infringement of the mark by the College. *See Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab., Inc.*, 997 F. Supp. 2d 92, 98 (D. Mass. 2014). On February 19, 2014, the district court issued a final order dismissing Lyons's claims because, *inter alia*, her claimed prior use did not cause the mark to acquire distinctiveness in the public mind. *Id.* at 105. The district court ordered the PTO to reject Lyons's application for registration on the Principal Register, but declined to cancel her registration on the Supplemental Register. *Id.* at 116–17.

After the district court's disposition, the Board refused Lyons's application for registration on the Principal Register, and resumed the cancellation proceeding relating to the registration on the Supplemental Register. The Board concluded that Lyons was not the owner of the mark, and that the underlying application for her registration on the Supplemental Register was void *ab initio*. *See Decision*, 2016 WL 1380739, at *19.

The Board explained that, although the cancellation proceeding was initially brought on grounds of likelihood of confusion, the "true issue [was] ownership of the mark" as between "a former organizing committee member and . . . the veterinary specialty organization she helped found." *Id.* at *8 (citing 15 U.S.C. § 1051(a)). The Board analyzed three factors to determine ownership of the mark: (1) the parties' objective intentions or expectations; (2) who the public associates with the mark; and (3) to whom the public looks to stand behind the quality of goods or services offered under the mark. *See id.* at *9 (citing *Wonderbread 5 v. Gilles*, 115 U.S.P.Q.2d (BNA)

1296, 1305 (T.T.A.B. 2015)). The Board found that all three factors favored the College.

First, the Board found that Lyons's interactions with the organizing committee were in the nature of "proposing and planning the formation of a [VSO]," not "providing the services herself." *Id.* at \*10. The Board noted Lyons's behavior in helping to draft the letter of intent, and in drafting the proposed bylaws and articles of incorporation—all toward forming a VSO under the name the organizing committee had already begun to use for the VSO, the "American College of Veterinary Sports Medicine and Rehabilitation" (i.e., the mark). *See id.* at \*10–12. The Board also pointed to the testimony of the other organizing committee members, who unanimously agreed that Lyons never indicated that she considered the mark to be her own or notified them that they were not to use the mark after her departure from the committee. *See id.* at \*12–14. In fact, the Board observed, the organizing committee believed that they had conceived of the mark themselves. *Id.* at \*13, \*17. Thus, the Board found that the objectively manifested intent of the parties weighed in favor of ownership by the College. *Id.* at \*14.

Second, the Board found that the relevant public associates the mark with the College, rather than with Lyons. *See id.* at \*16. The Board observed that the College had certified veterinarians in its specialty, had established residency programs, conducted annual conferences and meetings, maintained a public website, and is recognized as a specialty on the AVMA's website, accessible to the 80,000-plus veterinarian AVMA members. *See id.* at \*18. The Board explained that, while Lyons used the mark in a non-published document called "The Equine Excellence Initiative" as early as 1995, such use was "not use in commerce"—rather, it was "at most[] *de minimis* use that never acquired distinctiveness." *Id.* at \*16–17. In fact, the Board found that The Equine Excellence Initiative was written in the *future* tense—detailing

Lyons's plans for the VSO she envisioned forming. *Id.* at *16. The Board noted that Lyons does not employ any teachers, has no students, has not yet acquired any physical premises for offering her educational services, and has not certified any veterinarians, and that her nonprofit organization (formed before 1999) has no employees, volunteers, real estate, or significant assets. *Id.* at *17. Furthermore, the Board reasoned, because of Lyons's participation in the organizing committee between 1999 and 2004, any actions by Lyons "from that point on," undertaken in the name of the "American College of Veterinary Sports and Rehabilitation Medicine" and resulting in acquired distinctiveness of the mark, inured to the benefit of the College. *Id.* at *18.

Finally, the Board found that the relevant public looks to the College to stand behind the quality of the educational and certification services associated with the mark. The Board noted that veterinarians certified by the College "may hold themselves out as diplomates in an AVMA-approved specialty." *Id.* at *19. Moreover, the Board continued, the College's very name—the American College of Veterinary Sports Medicine and Rehabilitation—carries with it the AVMA's "seal of approval" because almost all AVMA-certified specialties (and none that are not AVMA-certified) use the prefix "American College of Veterinary" in the VSO name. *Id.* Thus, the Board concluded that the public would look to the College to stand behind the quality of the services associated with the mark, rather than to Lyons, "who left the American Veterinary Medical Association in 2005, abandoned all thought of obtaining a certification from that Association, has no students enrolled in educational courses offered under the mark, and has no certification program." *Id.*

In sum, the Board concluded that all "indicia of ownership" point to the College rather than to Lyons, and that the application underlying her registration on the Sup-

plemental Register was void *ab initio* because she never owned the mark. *Id.*

Lyons timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(B).

## DISCUSSION

We review the Board's legal conclusions *de novo*, *In re Int'l Flavors & Fragrances Inc.*, 183 F.3d 1361, 1365 (Fed. Cir. 1999), and the Board's factual findings for substantial evidence, *On-Line Careline, Inc. v. Am. Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003).

## I.

It is axiomatic in trademark law that ownership of a mark is predicated on priority of use in commerce. *See, e.g.*, *Holiday Inn v. Holiday Inns, Inc.*, 534 F.2d 312, 319 n.6 (C.C.P.A. 1976) ("It is fundamental that ownership of a mark is acquired by use, not by registration."); *Application of Deister Concentrator Co.*, 289 F.2d 496, 501 (C.C.P.A. 1961) (emphasizing that registration of a mark under the Lanham Act does not "create ownership," but rather is "only evidence thereof").

Thus, registration by one who did not own the mark at the time of filing renders the underlying application void *ab initio*. *See, e.g.*, *Holiday Inn*, 534 F.2d at 319 n.6 ("One must be the owner of a mark before it can be registered."); *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009) ("The registration of a mark that does not meet the use requirement is void ab initio.").

The statutory requirement for use in commerce applies to service marks as well as to trademarks. *Aycock Eng'g, Inc.*, 560 F.3d at 1357. Under the Lanham Act, a service mark is any "word, name, symbol or device, or any

combination thereof used by a person, or which a person has a bona fide intention to use in commerce . . . to identify and distinguish the services of one person . . . from the services of others and to indicate the source of the services." 15 U.S.C. § 1127.

For service marks, the "use in commerce" requirement is met when: (1) a mark is "used or displayed in the sale or advertising of services"; and (2) either (i) the services are "rendered in commerce" or (ii) the services are "rendered in more than one State or in the United States and a foreign country and the person rendering those services is engaged in commerce in connection with the services." 15 U.S.C. § 1127. Therefore, to meet the use requirement for a service mark, an applicant must use the mark in *advertising or sale* of a service, and show that the service was *actually rendered* in interstate commerce or in more than one state, or in this and a foreign country, by a person engaged in commerce.

A framework has developed in situations such as the present, where there has been a departure from or change of membership in a group, and both the departing member and the remnant group claim ownership of the mark. *See, e.g.*, *Wonderbread 5*, 115 U.S.P.Q.2d at 1297; *see generally*, 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:45 (4th ed. 2015).

For example, in *Wonderbread 5* the Board resolved a dispute regarding ownership of a band's name after the departure of one of its members. 115 U.S.P.Q.2d at 1297. Due to the absence of a formal agreement between the parties regarding ownership of the mark, the Board examined the "parties' statements and actions at the time" of the member's departure from the group. *Id.* at 1303. After finding that the evidence was inconsistent with the departing member's claim that he "owned the mark as an individual," the Board applied Professor

McCarthy's two-step test as a "useful adjunct" to its preliminary findings based on the parties' objective manifestations. *Id.* at 1303, 1305. For ownership disputes arising out of changes of membership in musical groups, McCarthy frames the inquiry as whether the mark "identif[ies] the group regardless of its members." 2 McCarthy § 16:45. To answer that question, McCarthy proposed a two-part analysis: first, one determines whether the mark is "personal to the individual members or not"; and second, if it is not, then it must be determined "for what quality or characteristic the group is known and who controls that quality." *Id.* The Board rephrased McCarthy's two-step inquiry in its findings to mean that "the consuming public did not associate" the mark with the departing member, and the group, rather than any individual member, "controlled the quality or characteristic of the band." *Wonderbread 5*, 115 U.S.P.Q.2d at 1307. Thus, the Board determined that the band owned the mark, the departing member's application for registration was void *ab initio*, and the resulting registration was invalid. *Id.*

This case presents a similar scenario, where Lyons was a member of a group (the organizing committee) and, after her departure from the group, both Lyons and the remnant committee (now the College) claim ownership of a mark used by the group while Lyons was still a member.

## II.

Although the College initiated this cancellation proceeding based on a likelihood of confusion and other grounds, the dispute in the case, as the Board found, centers on ownership of the mark, *Decision*, 2016 WL 1380739, at *8, which in turn depends upon priority of use in commerce, *Holiday Inn*, 534 F.2d at 319.

In a priority dispute, the Board's determination whether a trademark has been appropriated by first use

in commerce is a fact question that we review for substantial evidence. *See, e.g.*, *Aycock Eng'g, Inc.*, 560 F.3d at 1360 (upholding the Board's determination that the Appellant was not the first to use the service mark in commerce because that finding was "supported by substantial evidence").

On appeal, Lyons argues that the Board erred in finding that she did not own the mark at the time she filed her application because the evidence shows that she, not the College, was the first to use the mark in commerce. Lyons contends that she used the mark as early as 1995 in the fundraising document entitled "The Equine Excellence Initiative," which was "widely disseminated to the veterinary community, sport-horse industry, philanthropic organizations and the public." Appellant's Br. 21. Lyons asserts that, since 1996, she has continuously used the mark in commerce to conduct classes, clinical seminars, educational conferences, and workshops; create internship and externships for veterinary students; create, present, publish, sell, and distribute education materials, including booklets, presentations, and student test materials; create advertising educational programs; maintain an interactive website for educational programs; publish scholarship guidelines and applications; certify veterinarians; and provide student scholarships. *Id.* at 22. Since 1996, Lyons maintains, she has raised over two million dollars in grant support from fundraising conducted using the mark. *Id.* at 27.

The College responds that the Board correctly determined that the three factors relevant to ownership all demonstrate that the College owns the mark. First, the College asserts that the objectively manifested intent of the parties was that the mark would be used to name the VSO, which is exactly what has transpired. Appellee's Br. 23–24. Second, the College continues, the relevant public associates the mark with the College, not with Lyons, because the College has certified over 140 veterinarians

in approximately 33 states and 14 countries, established 13 active residency programs, collaborated with other AVMA-accredited VSOs to organize conferences and professional meetings, and maintains an active website. *Id*. at 30. Finally, the College argues that the public looks to the AVMA-accredited College to stand behind the quality of the education and certification services associated with the mark because those certified by the College may hold themselves out as AVMA-recognized specialists, whereas Lyons, on the other hand, cancelled her membership with the AVMA after being dismissed from the committee, abandoned plans to seek accreditation, and has no educational programs and no students. *Id*. at 35–36.

We agree with the College that the Board correctly determined that Lyons does not own the mark.

First, we find no error in the legal framework the Board used to evaluate ownership. The Board noted that, although various sources delineate the relevant test using different language, they all substantively include three main factors to be considered in ownership disputes surrounding service marks as between a departing member and the remnant group: (1) the parties' objective intentions or expectations; (2) who the public associates with the mark; and (3) to whom the public looks to stand behind the quality of goods or services offered under the mark. *Decision*, 2016 WL 1380739, at \*9 (citing *Wonderbread 5*, 115 U.S.P.Q.2d at 1305). We agree with the Board's articulation of the relevant factors and accept the legal framework it applied for resolving ownership disputes when there has been a departure from or change of membership in a group and, in the absence of a formal agreement governing ownership of the mark, both the departing member and the remnant group claim ownership of the mark.

Second, we conclude that the Board's findings regarding each of the three prongs of its analysis were supported by substantial evidence. We discuss the findings in turn.

## A. The Parties' Collective Intent

The Board determined that the parties' objective expectations were that Lyons and the rest of the organizing committee would form an AVMA-accredited VSO entitled "American College of Veterinary Sports Medicine and Rehabilitation," not that Lyons would render her own personal services using the mark. *Id.* at *10. Substantial evidence supports that finding.

The record shows that, even before meeting Gillette, Lyons intended to form an AVMA-accredited VSO entitled "American College of Veterinary Sports Medicine and Rehabilitation." J.A. 1114. Because the AVMA rules for accreditation require the formation of an organizing committee comprising a minimum of six members, some of them canine veterinarians, she reached out to Gillette and the other veterinarians to form the organizing committee. J.A. 504, 520, 525, 527. During her concerted action with the rest of the organizing committee, she held herself out to the AVMA as a member of the committee, acting on behalf of the intended VSO that she agreed to name the "American College of Veterinary Sports Medicine and Rehabilitation." J.A. 520, 566. At no point did she communicate to any of the other committee members her belief that she owned the mark, any prior use of the mark, or any objection to the committee naming the VSO after the mark. J.A. 477, 480–81, 483–84, 1420. In fact, she testified of her expectation that, at the end of the AVMA recognition process, the VSO would be named The American College of Veterinary Sports Medicine and Rehabilitation. J.A. 514.

Although some evidence may indicate Lyons's *subjective* belief that she owned the mark and would control the VSO once it was formed, J.A. 706–07, 1117, 1125, 1128,

1110–31, 1197, her *objectively* manifested expectations contradict that notion, J.A. 477, 480–81, 483–84, 1420. As the Board found, "[w]hatever secret reservations [Lyons] may have harbored were not reflected in her interactions with the other committee members." *Decision*, 2016 WL 1380739, at *12. Thus, the collective expectation of the parties, as objectively manifested, was that Lyons and the rest of the organizing committee would form an AVMA-accredited VSO with a name that became the mark. The Board's determination to that effect was supported by substantial record evidence.

### B. Who the Public Associates with the Mark

The Board next determined that the relevant public—the AVMA and veterinary community—associates the mark with the College, rather than with Lyons. *See id.* at *16. The Board found that Lyons engaged in at most "*de minimis*" use of the mark, and that her use never rose to the level of use in commerce sufficient to "create an association in the minds of the purchasing public" between Lyons and the mark. *Id.* at *16, *17. The Board relied upon substantial record evidence to support that finding.

First, the document Lyons cites as her first use of the mark, The Equine Excellence Initiative, was written in the future tense, indicating Lyons's *future* plans to form a VSO with the name of the mark. J.A. 832–39. But we have held that mere preparation and publication of future plans do not constitute use in commerce.[1] *See, e.g., Ay-*

---

[1]    Other aspects of the evidence pertaining to the Equine Excellence Initiative are problematic. Specifically, Lyons admits that she did not publish the Equine Excellence Initiative in a systematic or public way, that she did not maintain a mailing list or other documentation demonstrating to whom she sent the document, and

*cock Eng'g*, 560 F.3d at 1360 ("[M]ere preparations to use [the] mark sometime in the future will not do . . . ."); *id*. at 1358 ("[T]he advertising or publicizing must relate to an existing service which has already been offered to the public." (internal quotation marks omitted)); *see also Intermed Commc'ns, Inc. v. Chaney*, 197 U.S.P.Q. (BNA) ¶ 501, 507 (T.T.A.B. Dec. 23, 1977) ("Mere adoption (selection) of a mark accompanied by preparations to begin its use are insufficient . . . for claiming ownership of . . . the mark.").

Second, the record shows that Lyons has never engaged in advertising or marketing expenditures for the mark and, prior to 2003, had never maintained a website for herself or her wholly-owned nonprofit organization, Homecoming Farms. J.A. 502, 1112. In fact, according to the record, the first time the mark appeared online was in December 2002, when Gillette put the name of the VSO on the website he used for coordinating efforts of the organizing committee. J.A. 1121. Furthermore, the evidence indicates that Lyons has no employees or volunteers, no students enrolled in educational courses offered under the mark, and no certification program. J.A. 497–98, 1102, 1132, 1162.

On the other hand, there is evidence that the College has certified at least 115 veterinarians, established 13 active residency programs in veterinary colleges, and conducted conferences and continuing education programs in collaboration with other AMVA-accredited VSOs. J.A. 476–77. Furthermore, the AVMA published the committee's VSO petition to its 80,000-plus veterinarian members in the *Journal of American Veterinary Medicine* and in its electronic newsletter for the purpose of allowing its members to comment on it. J.A. 476, 1133. Moreover, the

---

that she has no evidence demonstrating that she sent it at all. J.A. 536–37.

College has obtained corporate sponsorships from companies in the veterinary industry and received considerable attention in the press. J.A. 476–77. Finally, the College, not Lyons, is listed on the AVMA's website regarding the VSO bearing the mark. J.A. 477.

As we have explained, the statute, 15 U.S.C. § 1127, requires both advertisement and actual use of the mark to satisfy the "use in commerce" requirement. *See Aycock Eng'g*, 560 F.3d at 1360 ("[A]dvertisement and actual use of the mark in commerce are required."); *see also Intermed*, 197 U.S.P.Q. at 507 (explaining that "[a]t the very least," in order to meet the use requirement, "there must be an open and notorious public offering of the services to those for whom the services are intended"); *id.* at 507–08 ("The statute requires not only the display of the mark in the sale or advertising of services but also the rendition of those services in order to constitute use of the service mark in commerce.").

Thus, substantial evidence supports the Board's finding that the relevant public looks to the College, not Lyons, for services in connection with the mark because Lyons's use of the mark has not created distinctiveness inuring to Lyons.

C. To Whom the Public Looks for Quality Control

Finally, the Board found that the relevant public looks to the College to stand behind the quality of the educational and certification services associated with the mark. *Decision*, 2016 WL 1380739, at *18–19. Substantial evidence supports that finding.

Because the College has earned AVMA accreditation, the veterinarians it certifies may hold themselves out as AVMA-approved specialists. J.A. 476. Indeed, the AVMA maintains a publicly-available website containing information about all AVMA-recognized organizations, including the College, which allows users of the website to

contact the College and to search for specialists by area of medicine and organization. J.A. 477, 1046–54. Furthermore, as the Board observed, the College's very name carries the "AVMA's seal of approval" because many AVMA-accredited VSOs, and none that are not AVMA-accredited, have names beginning with the words "American College of Veterinary." J.A. 1181. Lyons has produced no evidence that she has obtained similar certifications from the AVMA, that she has students enrolled in educational services offered under the mark, or that she offers any certification programs at all. Therefore, substantial evidence supports the Board's finding that members of the public who seek out veterinary sports medicine and rehabilitation services will rely upon the College's certification as evidence of a particular veterinarian's expertise. *Decision*, 2016 WL 1380739, at *19.

## III.

In sum, we conclude that the Board's findings were supported by substantial record evidence. One might even say that the lion's share of the evidence supports the Board's decision.

Although Lyons may have been the first to use the mark, the record shows that her use never rose to the level of use *in commerce*. Rather, she initiated efforts to form an AVMA-accredited VSO with the name of the mark, and that endeavor moved forward without her after she was dismissed from the organizing committee. Her involvement with the committee may have been the very reason that the committee adopted the mark; nevertheless, it is clear from the record that the College used the mark in commerce before Lyons, and Lyons cannot in effect appropriate it. The Board's findings to that effect were supported by substantial evidence.

CONCLUSION

We have considered the remaining arguments but find them to be unpersuasive. For the foregoing reasons, we affirm the decision of the Board.

**AFFIRMED**