This Opinion is a
Precedent of the TTAB

Mailed: August 15, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*CBC Mortgage Agency*
*v.*
*TMRR, LLC*

——

Cancellation No. 92076723

——

Brian Tucker of Kirton McConkie for CBC Mortgage Agency.

Joshua G. Gigger of Stoel Rives LLP for TMRR, LLC.

———

Before Taylor, Adlin and Lebow, Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

This is an ownership dispute between Respondent TMRR, LLC, which conceived a mortgage financing program to be run by a Native American tribe, and Petitioner CBC Mortgage Agency, an entity formed by the Paiute Indian Tribe of Utah to implement and operate the program Respondent conceived.

Respondent "created" the name CHENOA FUND to identify the program, and added a design element to the name, resulting in the mark at issue:

(the "CHENOA FUND Mark"). Respondent eventually registered

the CHENOA FUND Mark for "mortgage financing services; mortgage services, namely, buyer pre-qualification of mortgages for mortgage brokers and banks," in International Class 36 (the "Registration").[1]

In its amended petition to cancel the Registration, Petitioner pleads prior common law rights in the identical CHENOA FUND Mark for mortgage services, and ownership of an application to register CHENOA FUND in standard characters, also for mortgage services.[2] As grounds for cancellation, Petitioner alleges nonuse and non-ownership under Section 1(a) of the Act, based on its allegations that Respondent "has never used," and, at the time it filed the application underlying its Registration, "did not own," the CHENOA FUND Mark. Petitioner also alleges that Respondent fraudulently procured the Registration under Section 14(c) of the Act, and that Respondent's use of the CHENOA FUND Mark is likely to cause confusion under Section 2(d) of the Act because Petitioner uses an identical mark for identical services.

---

[1] Registration No. 5925880, issued December 3, 2019 with "FUND" disclaimed. The Registration includes this description of the mark: "The mark consists of the wording 'CHENOA FUND', 'CHENOA' in the color blue and 'FUND' in the color black with two red horizontal lines on either side of the word, and a dove outlined in the color blue with a red half circle above its head. White is not claimed as a feature of the mark and represents background or transparent areas, only."

[2] Application Serial No. 90557522 ("FUND" disclaimed), filed March 3, 2021 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on claimed dates of first use on September 27, 2020 for "matching borrowers with potential lenders in the field of mortgage lending," in International Class 35; and on July 13, 2013 for "charitable services in the nature of providing financial support to disadvantaged individuals for the purpose of assisting the individuals with down payments on homes; financial consulting; financial information; financial loan consultation; mortgage financing services; mortgage services, namely, buyer pre-qualification of mortgages for mortgage brokers and banks; providing financial assistance for assisting individuals with down payments on homes; providing financial information and financial advice via a website," in International Class 36.

In its answer, Respondent admits that the parties both claim use of the identical CHENOA FUND Mark for identical services, but otherwise denies the salient allegations in the amended petition for cancellation. Respondent also asserted "laches" and "acquiescence and estoppel" as affirmative defenses, but failed to pursue or prove those defenses at trial or argue them in its briefs, thereby forfeiting them. *In re Google Techs. Holdings, LLC*, 980 F.3d 858, 2020 USPQ2d 11465 (Fed. Cir. 2020); *NT-MDT LLC v. Kozodaeva*, 2021 USPQ2d 433, at *5 n.8 (TTAB 2021).

## I. The ACR Record

To their credit and the Board's significant benefit, the parties agreed to try this case via Accelerated Case Resolution ("ACR"). 12 TTABVUE.[3] Specifically, they agreed to: enter stipulations as to not only the authenticity of documents, but also the bulk of the relevant facts; waive pretrial and rebuttal disclosures; not call expert witnesses; resolve motions "by telephone conference with the Interlocutory Attorney"; and advance the trial/briefing schedule by almost a year. *Id.* at 1-2; 16 TTABVUE (Stipulation of Facts or "Stip."); 17 TTABVUE (Stipulation to Authenticity of Documents). In other words, the parties streamlined the case and logically organized the trial record, thus facilitating the Board's review of the evidence.[4]

---

[3] Citations to the record refer to TTABVUE, the Board's online docketing system. Specifically, the number preceding "TTABVUE" corresponds to the docket entry number(s), and any number(s) following "TTABVUE" refer to the page number(s) of the docket entry where the cited materials appear.

[4] The linchpin of this and many other ACR cases is the parties' agreement that "the Board may resolve genuine disputes of material fact and issue a final ruling based on the parties' ACR submissions." 12 TTABVUE 2.

The ACR record consists of the pleadings, the parties' extensive Stipulation of Facts accompanied by voluminous exhibits stipulated as authentic, 16-20 TTABVUE, and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of Respondent's Registration. In addition, Petitioner introduced:

> Testimony Declaration of William Todd Peterson, its Controller, and the exhibits thereto ("Peterson Dec."). 21 TTABVUE 52-559.
>
> Testimony Declaration of Miki Adams, its President ("Adams Dec."). 21 TTABVUE 560-62.
>
> Rebuttal Testimony Declaration of Brian Tucker, its attorney, and the exhibits thereto ("Tucker Reb. Dec."). 27 TTABVUE 28-44.[5]

Respondent introduced:

> Discovery deposition of Paul B. Terry, President and Chief Executive Officer of Cedar Band Corporation ("CBC"), a wholly owned tribal corporation of the Cedar Band of Paiutes ("CBP") of the Paiute Indian Tribe of Utah, and the exhibits thereto ("Terry Tr."). 20 TTABVUE 341-472, 594-601.
>
> Discovery deposition of Steven Sager, Petitioner's Associate General Counsel, who signed the application which matured into Respondent's Registration ("Sager Tr."). 20 TTABVUE 473-593.
>
> Testimony Declaration of Michael Whipple, its Co-Founder and Manager, and the exhibits thereto ("Whipple Dec."). 25 TTABVUE 55-155.

---

[5] We have not considered the Declaration of Steve Sager attached to the amended petition for cancellation. Trademark Rule 2.122(c).

Rebuttal Testimony Declaration of Joshua G. Gigger, its attorney, and the exhibits thereto ("Gigger Reb. Dec."). 29 TTABVUE 34-51.[6]

## II. The Parties, Their Relationship and the CHENOA FUND Mark and Registration

"Federal Housing Administration-insured home loans require a minimum down payment of 3.5% …." 16 TTABVUE 4 (Stip. ¶ 11). While "the down payment may not come from the seller of the home or someone that financially benefits from the sale," it may "be provided by a federal, state, or local government agency." *Id*. This regulatory regime brought the parties together.

Specifically, in 2012, Respondent's Managers, who claim to be "thought and market leaders in providing down payment assistance to home buyers," developed "a program to collaborate with a federal, state, or local government agency, namely, a federally-recognized Indian tribe, to offer down payment assistance of single family homes that are financed through FHA-insured loans where the down payment would be provided by an agency or corporation of a federally-recognized Indian tribe." *Id*. at 4, 6 (Stip. ¶¶ 12, 23); 19 TTABVUE 178. Respondent's Managers decided to call the program CHENOA FUND "because they believed 'chenoa' was a Sioux word that means 'white dove' and wanted the Chenoa Fund Program to reflect its tribal roots." *Id*. (Stip. ¶ 13). Michael Whipple, one of Respondent's Managers, registered the

---

[6] Although the Trademark Rules provide for only the plaintiff to have a rebuttal testimony period and the opportunity to file a trial reply brief, the parties stipulated that in this case they would each have a rebuttal testimony period and the opportunity to file "rebuttal" trial briefs. 12 TTABVUE 2.

domain names "chenoafund.com," "chenoafund.org" and "chenoafund.us" in March 2012. *Id.* (Stip.¶ 14); 19 TTABVUE 341-594.

Respondent's Managers then began shopping the proposed program to various Indian tribes, explaining in a promotional "Overview Document" that in 2012-2013 "Chenoa Fund exists as a concept and not a legal entity." 16 TTABVUE 9 (Stip. ¶ 24); 19 TTABVUE 46. However, Chenoa Fund was expected "to become legally incorporated when a federally recognized Indian tribe adopts the Chenoa Fund program and hires [Respondent's Managers] to manage the program for the Indian tribe." 16 TTABVUE 8-9 (Stip. ¶ 24). Respondent's Managers shopped the program to the Santee Sioux Nation, Ely Shoshone Tribe of Nevada and Northern Arapaho Council of the Arapaho Tribe of the Wind River Reservation, but found no takers.

Respondent's Managers then began negotiating with the Paiute Indian Tribe of Utah (Cedar Band of Paiutes), and, more specifically, CBC, the Tribe's wholly-owned tribal corporation. *Id.* at 11, 23-30 (Stip. ¶¶ 29, 49-54); 18 TTABVUE 244-271; 19 TTABVUE 236-243. The "TMRR Executive Summary" which Respondent's Managers presented to CBC during negotiations explained the nature of the proposal:

> [We] need a government entity to operate our program. We propose that your tribe or band form a temporary agency ("Agency") followed by a Section 17 corporation under the Indian Reorganization Act of 1934 (the "Corporation"). Your tribe will retain exclusive ownership of the Agency and Corporation. We will run the Agency and Corporation on a day-to-day basis, similar to what many tribes do when they create tribal casinos. Of course, your tribe or band will be involved in oversight of the Agency and Corporation.

*Id.* at 23 (Stip. ¶ 50); 18 TTABVUE 33.

6

Perhaps not surprisingly given what Respondent's Managers were proposing, CBC and Respondent's Managers had competing concerns. Specifically, CBC needed to maintain control over the contemplated "Agency" and any eventual "Corporation" to meet legal requirements imposed on Indian tribes engaging in these types of activities, while Respondent's Managers were concerned with bringing an idea and opportunity to CBC that CBC might, by learning from Respondent's Managers, develop the ability to co-opt or usurp.

As Mr. Terry put it during negotiations, CBC feared that "a Governmental regulator [would] come in once we reach some regulatory agency's radar screen, and see that the operations are being run by [Respondent] and not by both [Respondent] and CBC." 16 TTABVUE 25 (Stip. ¶ 53). Richard Ferguson, on behalf of Respondent's Managers, responded that Respondent did not "want to be in a position where we educate our 'Managers' [Petitioner] in all aspects of the business, creating a future risk that could displace us as Operators should there be a divergence of opinions on how the business should be run." *Id.* at 26 (Stip. ¶ 53). In any event, notwithstanding CBC's need to maintain adequate control over the contemplated program to comply with legal requirements, it understood that it would be relying on Respondent's Managers' know-how in providing down payment assistance through any newly-created tribal "agency," with Mr. Terry stating during negotiations "I understand who

is doing the heavy lifting and who is bringing the IP to this deal," and "[Respondent] is the breathing, living IP of this opportunity."[7] *Id.* at 24, 27 (Stip. ¶ 53).

CBC and TMRR ultimately entered into a formal contract to provide the program Respondent's Managers proposed: their Management Services Agreement of May 9, 2013 (the "MSA"). 16 TTABVUE 30 (Stip. ¶ 55); 18 TTABVUE 13-29.[8] A WHEREAS clause in the MSA summarizes the parties' business relationship as follows:

> [Respondent] has been developing certain products, business concepts and processes, and has otherwise conceived certain business, marketing and capitalization plans and models relative to offering real estate loans to low and moderate income families (the "Products"), and [CBC's owner] CBP has developed a complementary government and economic development structure to enable provision of the Products.

16 TTABVUE 32 (Stip. ¶ 56); 18 TTABVUE 13. CBC not only developed the "structure" necessary to provide the products, but also, according to another WHEREAS clause in the MSA, had the ability to "offer secondary financing for FHA

---

[7] Mr. Terry uses "IP" to refer to "intellectual property," but, as explained in more detail below, the parties' understanding and use of that term has not been clear or typical. For example, Mr. Ferguson stated during negotiations that Respondent's Managers wanted "to ensure we keep the 'living IP' (processing systems, customer data, user data, sales collateral, lender data, etc.)." 16 TTABVUE 28 (Stip. ¶ 53). Indeed, the parties have at times disputed whether "intellectual property," as that term was used during their negotiations and in their written agreements, encompasses the CHENOA FUND Mark.

[8] Respondent is identified in the MSA's first paragraph as "a Nevada limited liability company." 18 TTABVUE 13. However, Respondent's first "Representation and Warranty" in the MSA is that it "is a Wyoming limited liability company in good standing." *Id.* at 19. The record reveals that Respondent was registered as a Nevada LLC on May 8, 2013, but that the Nevada registration was not renewed and thus was revoked a year later, and that an entity also named "TMRR, LLC" was registered as a Wyoming LLC from mid-2014 through mid-2015. 16 TTABVUE 3 (Stip. ¶¶ 8-10); 18 TTABVUE 187, 202; 25 TTABVUE 69. While the parties raised this apparent discrepancy from time to time while litigating this case, they ultimately seem to have dropped the issue in their ACR Briefs.

loans issued under the National Housing Act." 16 TTABVUE 32 (Stip. ¶ 56); 18 TTABVUE 13.

Pursuant to the MSA, CBC formed Petitioner as a subdivision, i.e. subsidiary, "to operate as a government agency of CBP" and offer the CHENOA FUND program. 16 TTABVUE 32-33 (Stip. ¶ 56); 16 TTABVUE 42 (Stip. ¶ 60) ("In or about May 2013 … CBC formed [Petitioner] as a wholly owned subdivision of CBC."); 18 TTABVUE 14 (MSA Art. I). *See also* 20 TTABVUE 382-383 (Terry Tr. 42-43) (Petitioner is "a wholly-owned subsidiary" of CBC, "[w]e call it a subdivision … a legal term of art in our industry"); 20 TTABVUE 500-501 (Sager Tr. 28-29) (CBC "is 100 percent owner of [Petitioner]."). Petitioner then "appointed" and "employed" Respondent "to act, under the direction of CBC … as [Petitioner's] sole and exclusive agent for the management and control of the Agency in operating the Business." 16 TTABVUE 33 (Stip. ¶ 56); 18 TTABVUE 14 (MSA § 2.01). The MSA specifically defines the parties' relationship:

> CBC and [Respondent] establish by this Agreement a joint oversight and management relationship for [Petitioner]. CBC will own [Petitioner] exclusively. [Respondent] will manage and operate [Petitioner], under the oversight of CBC. [Respondent] will act as the appointed agent and representative of [Petitioner]. Nothing in this Agreement shall be construed as creating a tenancy or joint venture, or any other similar relationship between the parties … except that of owner and contracted day-to-day operator, or principal and agent jointly overseeing and managing [Petitioner].

16 TTABVUE 33 (Stip. ¶ 56); 18 TTABVUE 14 (MSA § 2.02). Moreover, Petitioner's Amended and Restated Charter of Incorporation provides that: (1) Petitioner "shall be wholly owned by [CBC];" (2) "[n]o individual or legal entity other than CBC shall

9

own or acquire any of the voting shares in [Petitioner];" and (3) "[t]he business and affairs of [Petitioner] shall be managed exclusively by a board of directors," which is coextensive with CBC's Board of Directors. 18 TTABVUE 120.

Thus, while Respondent has "joint" responsibility for "overseeing and managing" Petitioner, the "principal" in the parties' relationship is Petitioner. Respondent is Petitioner's "agent," and is also referred to in the MSA as Petitioner's "appointed agent" and "contracted day-to-day operator." Petitioner specifically bargained for that arrangement during negotiations over the MSA. 18 TTABVUE 244-45 (CBC's attorney informed Mr. Terry that Respondent's Managers will "have to accept more CBC control if they want to make a straight faced argument that it is a tribal government instrumentality. If they don't want to protect that status it seems to promise a short life span."); *see also id.* at 248-265 ("marked up" draft MSA). When asked "what role did [Respondent] play in creating [Petitioner]?," Mr. Terry responded "[t]he concept was their [Respondent's] role. The creation was us [Petitioner]." 20 TTABVUE 386 (Terry Tr. 46).

Indeed, the MSA makes clear that the principal-agent relationship is essentially a prerequisite to offering the CHENOA FUND program: "In order for [Petitioner] to qualify as a CBP tribal government agency, jointly managed by CBC, [Respondent's] day-to-day management authority referenced in this Agreement is limited by CBC's ultimate ownership, oversight, and supervisory authority to operate and control [Petitioner]." 18 TTABVUE 16 (MSA § 3.01(e)). As Respondent succinctly explained in the CHENOA FUND program's Executive Summary, "we need a government

10

entity to operate our program." 16 TTABVUE 23 (Stip. ¶ 50). Under the MSA, CBC is entitled to a larger share of the net profits from loan origination and loan servicing and liquidation, with Respondent entitled to the rest. 18 TTABVUE 18 (MSA §§ 4.02, 4.04).

The MSA includes the following Intellectual Property clause about which the parties have competing interpretations:

> [Petitioner] acknowledges that previous to the Effective Date of this Agreement, CBC and [Respondent] have each developed, and will continue to develop various intellectual property associated with the proposed activities of [Petitioner], including loan programs, program guidelines, marketing materials, websites and information technology processing systems and databases, [(]hereinafter respectively "CBC's IP" and "[Respondent's] IP") that are and shall remain the property of CBC and [Respondent], respectively. Notwithstanding, CBC and [Respondent] each hereby grants [Petitioner] a fully-paid up, irrevocable license under CBC's IP and [Respondent's] IP to use respectively CBC's IP and [Respondent's] IP and to make derivative works of [Respondent's] IP ("Derivative Works", as defined by U.S. Copyright Law) in operating [Petitioner] which shall survive any termination of this Agreement. [Petitioner] shall own all right, title and interest in and to any and all intellectual property created or obtained by [Petitioner] in operating the activities of [Petitioner]. [Petitioner] shall own all right, title and interest in all property other than intellectual property owned by CBC and [Respondent].

18 TTABVUE 25 (MSA § 10.02).

While CBC formed Petitioner in May 2013 pursuant to the MSA, Petitioner did not complete its first mortgage financing transaction until November 2014, following more than a year of making preparations to do so. 16 TTABVUE 43, 46 (Stip. ¶¶ 62, 68) (Petitioner "began offering 'mortgage financing services and buyer pre-

11

qualification of mortgages for mortgage lenders and banks' (the 'Chenoa Fund Services') under the [CHENOA FUND Mark] in late 2014"); 18 TTABVUE 76.

At some point in 2014, CBC appointed Robert Hicks, one of Respondent's Managers, to be President of Petitioner. Later, in December 2014, CBC, "as manager for [Petitioner]," accepted Mr. Hicks's resignation, and appointed two of Respondent's other Managers, Richard Ferguson and Michael Whipple, as Petitioner's President and Vice President, respectively. 16 TTABVUE 44 (Stip. ¶ 65). Mr. Ferguson and Mr. Whipple are Petitioner's employees. 20 TTABVUE 355 (Terry Tr. 15). The Resolution of CBC's Board of Directors which made the appointments also provided that Petitioner's President "shall report directly to [CBC's] Board, or the Board's assigned representative." 16 TTABVUE 45 (Stip. ¶ 65); 18 TTABVUE 59-60. According to the "chenoafund.com" website, Petitioner "created the Chenoa Fund™ program to help lenders to assist their borrowers to obtain the minimum required investment on a mortgage." 16 TTABVUE 48 (Stip. ¶ 74).

In May 2019, Messrs. Ferguson and Whipple (Respondent's Managers who had been appointed Petitioner's President and Vice President, respectively), instructed Steven Sager, [Petitioner's] Associate General Counsel, "to file an application to register the [CHENOA FUND Mark] for the Chenoa Fund Services with the U.S. Patent and Trademark Office." *Id.* (Stip. ¶ 75). Mr. Sager prepared the application originally identifying Petitioner as the mark's owner, following which Mr. Ferguson sent Mr. Sager an e-mail instructing him to "make sure the ownership of the trademark is in [Respondent's] name." *Id.* (Stip. ¶¶ 76-77); 18 TTABVUE 39. Mr.

12

Sager then "changed the applicant from [Petitioner] to [Respondent]," and the application matured into the Registration later that year. 16 TTABVUE 48, 51 (Stip. ¶¶ 78, 93).[9] Neither Respondent nor Mr. Ferguson informed CBC of the application; nevertheless, Petitioner paid Mr. Sager for filing the application and reimbursed him for the filing fee. *Id.* at 48, 50 (Stip. ¶¶ 80-81, 87-91); 18 TTABVUE 3-4, 43-47.

Petitioner's marketing materials, however, make clear that Petitioner is the source of CHENOA FUND services, as shown in the following typical example:



---

[9] Mr. Sager testified that he "didn't know who [Respondent] was" at the time. 20 TTABVUE 503-04 (Sager Tr. 31-32). That is, he did not know about the MSA, that Respondent was a "contracted manager" or that Respondent had no ownership interest in Petitioner. "I was just told to register that mark by Richard Ferguson," who at the time was Petitioner's President, "and I thought [Respondent] was just maybe a holding company for [Petitioner] … I had no, you know, reason to believe that we weren't registering the mark for the benefit of [Petitioner]." *Id.* at 504 (Sager Tr. 32).

18 TTABVUE 6 (highlighting added). As shown in this August 2018 Wayback Machine website capture, the CHENOA FUND Mark appears at the top of the page, and the site explains that "Chenoa Fund is an affordable housing program provided through [Petitioner]." The site also states that Petitioner "created Chenoa Fund." The site does not mention Respondent. *Id. See also id.* at 7-9.[10] Even in July 2013, shortly after CBC formed Petitioner, the "chenoafund.org" website indicated that "Chenoa Fund is a program offered by [Petitioner], an agency of a federally recognized Indian tribe under the Indian Reorganization Act of 1934." *Id.* at 10. In fact, the record reveals that the CHENOA FUND Mark is always associated with Petitioner rather than Respondent in the CHENOA FUND program's marketing materials. *Id.* at 11, 30-31, 34-38, 203, 208-236, 241; 19 TTABVUE 600-890; 20 TTABVUE 3-273, 277-340.

## III. Petitioner's Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action is a requirement in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S.Ct. 82 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014)). A party in the position of plaintiff may petition to cancel the registration of a mark when doing so is within the zone of interests protected by the statute and it has a

---

[10] A 2019 video on the Chenoa Fund YouTube channel attempts to correct the "common misconception" that Petitioner is named "Chenoa Fund," explaining that "[t]he name of our company is CBC Mortgage Agency [Petitioner] and the Chenoa Fund is the name for the suite of products and programs that we offer to borrowers in need of down payment assistance." 16 TTABVUE 52 (Stip. ¶ 106); 18 TTABVUE 239.

reasonable belief in damage that is proximately caused by continued registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at * 6-7 (Fed. Cir. 2020), *cert. denied*, 141 S.Ct. 2671 (2021) (holding that the test in *Lexmark* is met by demonstrating a real interest in opposing or cancelling a registration of a mark, which satisfies the zone-of-interests requirement, and a reasonable belief in damage by the registration of a mark, which demonstrates damage proximately caused by registration of the mark).

Here, Petitioner's use of the CHENOA FUND Mark, and application to register CHENOA FUND for itself, establish that it is entitled to seek cancellation of Respondent's Registration of the CHENOA FUND Mark for in-part identical services. 32 TTABVUE 3, 4, 34 TTABVUE 2-10 and 35 TTABVUE 3-21 (Schillo Dec. ¶¶ 4, 5, 11-13 and Exs. S6-8); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982) ("We regard the desire for a registration with its attendant statutory advantages as a legitimate commercial interest."); *Toufigh v. Persona Parfum Inc.*, 95 USPQ2d 1872, 1874 (TTAB 2010); *Syngenta Crop Prot. Inc. v. Bio-Chek LLC,* 90 USPQ2d 1112, 1118 (TTAB 2009) (testimony that opposer uses its mark "is sufficient to support opposer's allegations of a reasonable belief that it would be damaged ….").

**IV. Which Party Owns the CHENOA FUND Mark?**

"[O]nly the owner of the mark may file an application" to register it. *Wonderbread 5 v. Gilles*, 115 USPQ2d 1296, 1303 (TTAB 2015); *see also In re Deister Concentrator Co.*, 289 F.2d 496, 129 USPQ 314, 320 (CCPA 1961). Thus, "an application filed by one who is not the owner of the mark sought to be registered is a void application."

15

*In re Tong Yang Cement Corp.*, 19 USPQ2d 1689, 1690 (TTAB 1991) (citing *In re Techsonic Indus., Inc.*, 216 USPQ 619 (TTAB 1982)). *See also*, 15 U.S.C. § 1051(a); *Lyons v. Am. Coll. of Veterinary Sports Med. & Rehab.*, 859 F.3d 1023, 123 USPQ2d 1024, 1027 (Fed. Cir. 2017) ("[R]egistration by one who did not own the mark at the time of filing renders the underlying application void ab initio.") (citations omitted); *Huang v. Tzu Wei Chen Food Co., Ltd.*, 849 F.2d 1458, 7 USPQ2d 1335 (Fed. Cir. 1988); *Great Seats, Ltd. v. Great Seats, Inc.*, 84 USPQ2d 1235, 1239 (TTAB 2007) ("In a use-based application under Trademark Act Section 1(a), only the owner of the mark may file the application for registration of the mark; if the entity filing the application is not the owner of the mark as of the filing date, the application is void ab initio."); Trademark Rule 2.71(d), 37 C.F.R. § 2.71(d) ("An application filed in the name of an entity that did not own the mark as of the filing date of the application is void.").

"In cases such as this where the parties have either a prior or current relationship, the question of [which party] is, in fact, the owner of the mark 'must be determined on a case by case basis dependent on the particular facts adduced in each case.'" *Wonderbread 5*, 115 USPQ2d at 1303 (quoting *In re Briggs*, 229 USPQ 76, 77 (TTAB 1986). Generally, however, there are "three main factors to be considered in ownership disputes surrounding service marks as between a departing member and the remnant group: (1) the parties' objective intentions or expectations; (2) who the public associates with the mark; and (3) to whom the public looks to stand behind the quality of goods or services offered under the mark." *Lyons*, 123 USPQ2d at 1028.

16

While we recognize that this case does not involve an ownership dispute "between a departing member and the remnant group," as the *Lyons* case did, we do not believe the factual differences between this case and *Lyons* render the *Lyons* test inapplicable here. In fact, the *Lyons* factors are substantially similar to and in some ways subsume those applied in other types of ownership disputes, including disputes over trademarks rather than service marks, and disputes in which, unlike this case, there was no written agreement between the parties. *Cf. UVeritech, Inc. v. Amax Lighting, Inc.*, 115 USPQ2d 1242, 1249 (TTAB 2015) (trademark rather than service mark case setting forth "several relevant factors" to consider in resolving ownership disputes when, unlike here, "there is a neglect of formalities in defining the business relationship between the parties"); *Wrist-Rocket Mfg. Co. v. Saunders*, 379 F.Supp. 902, 183 USPQ 17 (D. Neb. 1974), *aff'd in part and rev'd in part*, 516 F.2d 846, 186 USPQ 5 (8th Cir. 1975).[11] At the same time, we recognize that the facts of this case are fairly unique and we therefore do not apply the *Lyons* factors mechanically or exclusively; rather, they guide our analysis of the record.

Petitioner bears the burden of proving by a preponderance of the evidence that Respondent does not own the CHENOA FUND Mark. *Wonderbread 5*, 115 USPQ2d at 1302.

---

[11] The parties in *UVeritech* did not have a written agreement. *UVeritech*, 115 USPQ2d at 1245.

17

### A. Objective Intentions or Expectations

This ownership dispute is perhaps somewhat atypical in that the parties have a written agreement, the MSA. There is no better evidence of their objective intentions and expectations. Indeed, as Petitioner points out, 21 TTABVUE 14, the MSA is governed by Utah law, 18 TTABVUE 26 (MSA § 10.08), under which, in the absence of contractual ambiguity, the MSA determines "the intent of the contracting parties." *Café-Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 207 P.3d 1235, 1240 (Utah 2009) ("the parties' intentions are determined from the plain meaning of the contractual language").

The MSA is unambiguous. It establishes the parties' objective intent and expectation that Petitioner would solely own the CHENOA FUND Mark.

This is clear from the following MSA clauses relating specifically to the parties' roles and responsibilities with respect to the mortgage services offered under the CHENOA FUND Mark:

> WHEREAS, the CBC and [Respondent] have made a good faith determination that the CBC, or a division thereof, can offer secondary financing for FHA loans insured under the National Housing Act. 18 TTABVUE 13 (MSA, 8th WHEREAS clause);

> The CBC agrees to … create, by resolution, in substantially the form identified in Exhibit A, a subdivision of CBC known as the CBC Mortgage Agency [Petitioner] to operate as a government agency of CBP for regulatory and economic development purposes, including conducting the Business.[12] *Id.* at 14 (MSA Art. I);

---

[12] "Business" is a defined term in the MSA and means "offering real estate loans to low and moderate income families." 18 TTABVUE 13. These services are encompassed by the Registration's identification of services.

[Petitioner] hereby appoints and employs [Respondent] to act, under the direction of the CBC and such personnel of the CBC as determined by the CBC, as [Petitioner's] sole and exclusive agent for the management and control of [Petitioner] in operating the Business. *Id.* (MSA § 2.01);

CBC will own [Petitioner] exclusively. [Respondent] will manage and operate [Petitioner], under the oversight of CBC. [Respondent] will act as the appointed agent and representative of [Petitioner]. Nothing in this Agreement shall be construed as creating a tenancy or joint venture, or any other similar relationship between the parties hereto, except that of owner and contracted day-to-day operator, or principal and agent jointly overseeing and managing [Petitioner]. *Id.* (MSA § 2.02);

[Petitioner] shall own, operate and manage [Petitioner] as a wholly owned governmental and business development instrumentality of the CBC for the CBP. *Id.* at 15 (MSA § 3.01(a));

Subject to the supervisory oversight and approval of the CBC, [Respondent] shall prepare such documentation as legally necessary for [Petitioner] to conduct the Business. *Id.* (MSA § 3.01(c));

In order for [Petitioner] to qualify as a CBP tribal government agency, jointly managed by CBC, [Respondent's] day-to-day management authority referenced in this Agreement is limited by CBC's ultimate ownership, oversight, and supervisory authority to operate and control [Petitioner]. *Id.* at 16 (MSA § 3.01(e)).

Thus, while Respondent has a great deal of operational responsibility, and even substantial management authority under the MSA, the MSA goes to great lengths and pains to repeatedly make clear, and leave no doubt, that CBC rather than Respondent owns and controls the business that offers mortgage services under the CHENOA FUND Mark.

In fact, pursuant to the MSA, CBC created Petitioner for the purpose of "conducting the Business." 18 TTABVUE 14 (MSA Art. I). While Respondent conceived of the mortgage business offered under the CHENOA FUND Mark, its role in managing the provision of mortgage services arises out of its appointment and employment by Petitioner "to act, under the direction of the CBC," as its "exclusive agent." *Id.* (MSA § 2.01). Respondent acts "under the oversight of CBC," making CBC the ultimate authority, and giving it ultimate control over the mortgage services provided under the CHENOA FUND Mark. *Id.* (MSA § 2.02). The MSA is crystal clear that Petitioner "shall own, operate and manage" the Business. *Id.* at 15 (MSA § 3.01(a)). Mr. Ferguson essentially conceded the point in an e-mail sent to Petitioner's employees:

> In May 2013, the Cedar Band formed [Petitioner], and hired me, Todd, and Mike to manage the new government entity. Chenoa Fund is the name of the DPA [down payment assistance] program created. It may surprise some of you to know that none of us has any ownership in the business. It is 100% owned by the Cedar Band of the Paiute nation. They are deeply involved in ensuring the business is run in accordance with their governmental controls and bylaws.

16 TTABVUE 47 (Stip. ¶ 72); 18 TTABVUE 243.

Not only does the MSA give CBC "ultimate ownership, oversight and supervisory authority to operate and control" Petitioner, but it also explicitly makes this arrangement a prerequisite to offering the services at all, as the MSA grants authority to Petitioner "[i]n order for [Petitioner] to qualify as a CBP tribal government agency." *Id.* at 16 (MSA § 3.01(e)). As Petitioner puts it in its Trial Brief,

and Respondent does not dispute, "[a] non-governmental entity, such as [Respondent], cannot be the source of the down payment for an FHA loan and therefore could not engage in commerce under the Chenoa Fund business model." 21 TTABVUE 9. As Respondent put it in its Executive Summary, "we need a government entity to operate our program." 16 TTABVUE 23 (Stip. ¶ 50); 18 TTABVUE 33.

The MSA meets that "need," while giving Petitioner exactly what it bargained hard for during negotiations – "ultimate ownership, oversight and supervisory authority to operate and control." 18 TTABVUE 16 (MSA § 3.01(e)). At the same time, the MSA explicitly rules out any theory that it creates "a tenancy or joint venture, or any other similar relationship between the parties hereto, except that of owner and contracted day-to-day operator, or principal and agent jointly overseeing and managing [Petitioner]." *Id.* (MSA § 2.02).

The parties' intentions and expectations are also revealed by use of the CHENOA FUND Mark in promotional and informational materials. These materials always identify Petitioner as the source of the mortgage services identified in the Registration. They do not identify Respondent as another source of the mortgage services; in fact, they do not identify Respondent at all. *Id.* at 11, 30-31, 34-38, 203, 208-236, 241; 19 TTABVUE 600-890; 20 TTABVUE 3-273, 277-340.

This is exactly how the parties set up the CHENOA FUND mortgage program in the MSA. "CBC will own [Petitioner] exclusively." 16 TTABVUE 33 (Stip. ¶ 56); 18 TTABVUE 14 (MSA § 2.02). Moreover, CBC's Board of Directors manages Petitioner "exclusively."

21

While Respondent argues that it nevertheless owns the CHENOA FUND Mark because Respondent "created" that mark in 2012, as Petitioner points out, the CHENOA FUND Mark did not in fact exist in 2012; it was merely a concept.[13] Indeed, the parties stipulated that although Respondent promoted its CHENOA FUND concept in 2012 and 2013, offering it to several tribes which ultimately were not interested, none of the CHENOA FUND mortgage services identified in the Registration were provided to customers until 2014. 16 TTABVUE 43, 46 (Stip. ¶¶ 62, 68); 18 TTABVUE 76. In short, Petitioner, not Respondent, first provided those CHENOA FUND mortgage services to others in 2014. 16 TTABVUE 46 (Stip. ¶ 68) (Petitioner "began offering mortgage financing services and buyer pre-qualification of mortgages for mortgage lenders and banks (the '**Chenoa Fund Services**') under the CHENOA FUND [Mark] in late 2014.)"

Respondent's mere "creation" and promotion of the mark two years earlier does not reveal which party owns service mark rights in the CHENOA FUND Mark for mortgage services.[14] *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1 USPQ2d 1772, 1774 (Fed. Cir. 1987) ("Mere invention, creation, or discussion of a trademark does not create priority rights.") (citation omitted); *Hole In 1 Drinks*, 2020 USPQ2d 10020, at *9 ("To the extent that Respondent argues he created the mark, trademark rights are not gained by creating a mark, but through use of the mark.");

---

[13] As stated in the Chenoa Fund Program Overview Document, "Chenoa Fund exists as a concept and not a legal entity." 16 TTABVUE 9 (Stip. ¶ 24); 19 TTABVUE 46.

[14] Ownership of the CHENOA FUND logo copyright is beyond of the scope of this decision (as well as the Board's limited jurisdiction).

*Reflange Inc. v. R-Con Int'l*, 17 USPQ2d 1125, 1130 (TTAB 1990) ("While there is no question that Rocky coined the term R-CON, it is not the act of inventing a trademark which creates prior rights."). Rather, a service mark must be "used" in commerce, meaning not only that it must be "used or displayed in the sale or advertising of services," but also that the services must be "rendered in commerce." 15 U.S.C. § 1127.

In other words, "preparations to use a mark in commerce are insufficient to constitute use in commerce. Rather, the mark must be actually used in conjunction with the services described in the application for the mark." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 90 USPQ12d 1301, 1308 (Fed. Cir. 2009). More specifically, "[r]endering services requires actual provision of" the services to the intended customers therefor, here: (1) homebuyers seeking down payment assistance or other mortgage services identified in the Registration; and (2) mortgage brokers and banks seeking buyer pre-qualification or other services identified in the Registration. *Couture v. Playdom, Inc.*, 778 F.3d 1379, 113 USPQ2d 2042, 2044 (Fed. Cir. 2015); *Aycock*, 90 USPQ2d at 1308-09 ("Mr. Aycock had to develop his company to the point where he made an open and notorious public offering of his AIRFLITE service to **intended customers**.") (emphasis added); *La Maur Inc. v. Int'l Pharm. Corp.*, 199 USPQ 612, 616 (TTAB 1978) ("to bestow a proprietary right in and to a trademark," use must reach "to purchasers or prospective purchasers of the goods in which the mark is claimed for use"). *See also Lyons*, 123 USPQ2d at 1027-28 ("to meet the use requirement for a service mark," there must be a showing "that the service

23

was *actually rendered* in interstate commerce or in more than one state, or in this and a foreign country, by a person engaged in commerce").[15] The tribes to which Respondent shopped the proposed CHENOA FUND program in 2012 and 2013 were not the intended customers for the mortgage services identified in the Registration. Rather, they, like Petitioner, were targeted because they were capable of forming the "government entity" Respondent "needed" to provide mortgage services to the intended customers therefor.

Thus, Respondent's intent in 2012 and 2013 was to collaborate with a tribal corporation that could, at some undetermined point in the future, render the identified services. However, in 2012 and 2013 Respondent and CBC could not have intended Respondent to own the CHENOA FUND Mark; indeed, at the time that mark did not exist because it had not yet been used for the identified mortgage services.[16] Thus, the MSA does not address the then-nonexistent CHENOA FUND Mark. When the CHENOA FUND Mark was eventually first used in commerce in 2014 (by Petitioner), the parties' intent, as clearly expressed in the unambiguous

---

[15] Respondent's registration of "chenoafund" domain names does not constitute use in commerce. *Stawski v. Lawson*, 129 USPQ2d 1036, 1045 (TTAB 2018). *See also Brookfield Commc'ns., Inc. v. W. Coast Entm't. Corp.*, 174 F.3d 1036, 50 USPQ2d 1545, 1555 (9th Cir. 1999). In any event, Petitioner "uses" those domain names. They resolve to Petitioner's website which identifies Petitioner as the source of CHENOA FUND services. 16 TTABVUE 46 (Stip. ¶ 70); 18 TTABVUE 11, 30-31, 34-38, 203, 208-236, 241; 19 TTABVUE 600-890; 20 TTABVUE 3-273, 277-340.

[16] Petitioner did not come into existence until CBC created it pursuant to the MSA. 18 TTABVUE 14 (MSA Art. I).

MSA, was that it would identify Petitioner's mortgage services, provided with assistance from Respondent, Petitioner's "appointed agent."

Respondent's reliance on the MSA's "Intellectual Property" clause in support of its claim to own the CHENOA FUND Mark is misplaced. As Petitioner points out, when that clause and the MSA as a whole went into effect in 2013, the CHENOA FUND Mark had not yet been used for the mortgage services identified in the Registration.[17] 16 TTABVUE 43, 46 (Stip. ¶¶ 62, 68); 18 TTABVUE 76; *Couture*, 113 USPQ2d at 2044; *Aycock*, 90 USPQ2d at 1308. Thus, the Intellectual Property clause, which by its terms covers intellectual property developed "previous to the Effective Date of this Agreement," does not encompass the CHENOA FUND Mark. 18 TTABVUE 25 (MSA § 10.02). As Respondent puts it in its Rebuttal Trial Brief, "[t]he MSA contains no reference to the Chenoa Fund Mark or any other mark." 29 TTABVUE 27.

However, under the same Intellectual Property clause, Petitioner "shall own all right, title and interest in and to any and all intellectual property created or obtained by [Petitioner] in operating the activities of [Petitioner]." This post-effective date intellectual property includes the CHENOA FUND Mark, which in 2014 came into existence as an identifier of the mortgage services first offered and rendered by

---

[17] In 2012 and 2013, Respondent was "using" the name CHENOA FUND and its associated logo in connection with its efforts to convince a Native American tribe to offer certain mortgage services that only governmental entities could offer. Respondent was legally prohibited from offering those mortgage services itself, however. 16 TTABVUE 4 (Stip. ¶ 11). In other words, as between Petitioner and Respondent, only Petitioner could legally offer the services Petitioner eventually offered under the CHENOA FUND Mark.

Petitioner (with Respondent's assistance as Petitioner's "appointed agent").[18] 16 TTABVUE 46 (Stip. ¶ 69) ("Since November 2014, [Petitioner] has continuously provided the Chenoa Fund Services under the Chenoa Fund [Mark] in interstate commerce."). According to the "chenoafund.com" website, Petitioner "is a federally chartered, public-purpose governmental entity. [Petitioner] created the Chenoa Fund™ program to help lenders to assist their borrowers to obtain the minimum required investment on a mortgage." *Id.* at 48 (Stip. ¶ 74).[19]

---

[18] "Intellectual property" typically includes patents, trademarks, copyrights and trade secrets, but the specific types of "intellectual property" mentioned in the MSA's "Intellectual Property" clause are more in the nature of business materials, such as "loan programs," "program guidelines" and "websites." The MSA's "Intellectual Property" clause does not mention trademarks or service marks at all, much less the CHENOA FUND Mark specifically (which did not yet exist when the parties executed the MSA). 29 TTABVUE 27 ("The MSA contains no reference to the Chenoa Fund Mark or any other mark."). In fact, prior to entering into the MSA, the parties did not discuss ownership of the CHENOA FUND Mark or any variation thereof. 20 TTABVUE 458-459 (Terry Tr. 118-119).

[19] Because Petitioner owns the CHENOA FUND Mark under the Intellectual Property clause, Respondent's argument that the MSA "expressly granted [Petitioner] an express license" to use the mark, 25 TTABVUE 35-38, is untenable. Respondent could not license what it did not own. Of course, the argument is also untenable because nothing in the MSA, including the Intellectual Property clause, licenses the CHENOA FUND Mark to anyone, as that mark did not come into existence until it was used, more than a year after the MSA came into effect. Respondent's reliance on *Pneutek, Inc. v. Scherr*, 211 USPQ 824 (TTAB 1981), 29 TTABVUE 12-13, is misplaced because, among other things, in *Pneutek* there was a formal license agreement, 211 USPQ at 828, which specifically identified the licensed mark and its owner, constrained the licensee's use of the mark and provided for quality control. The "license" in the MSA's Intellectual Property clause does none of that, even if it could be read to specifically cover the CHENOA FUND Mark, as Respondent admits in its Rebuttal Trial Brief. 29 TTABVUE 19 ("Nothing in the MSA required or even contemplated use of the Chenoa Fund Mark for the Chenoa Fund Program."); 29 TTABVUE 27 ("The MSA contains no reference to the Chenoa Fund Mark or any other mark. And Section 10.02 of the MSA does not expressly define ownership of the Chenoa Fund Mark.").

### B. Who the Public Associates With the CHENOA FUND Mark

Petitioner's consistent, and apparently exclusive use of the CHENOA FUND Mark in connection with mortgage services significantly impacts this factor as well, especially because there is no evidence that Respondent has ever used the CHENOA FUND Mark for mortgage services. 18 TTABVUE 11, 30-31, 34-38, 203, 208-236, 241; 19 TTABVUE 600-890; 20 TTABVUE 3-273, 277-340; 25 TTABVUE 23 (Respondent's concession in its Trial Brief that "the Chenoa Fund Program was generally advertised and promoted" as a program "offered," "provided," "managed" and "administered" by Petitioner).[20] *See Lyons*, 123 USPQ2d at 1031 (finding that "the relevant public looks to the College, not Lyons," in part because "the College, not Lyons, is listed on the AVMA's website regarding the VSO bearing the mark").

Put simply, while Respondent operates behind the scenes, out of public view, Petitioner is out front, engaging with the public via materials that identify Petitioner, and only Petitioner, as the source of the mortgage financing services rendered in connection with the CHENOA FUND Mark. *Id.* The situation here is analogous to

---

[20] Respondent's inclusion of the mark in promotional materials it prepared 10 years ago for Native American tribes it viewed as potential business partners is not use of the mark for the mortgage services identified in the Registration. In those materials, Respondent was not offering mortgage services to potential customers thereof, but instead seeking business partners to realize and promote its business plan to team up with a tribe that would offer down payment assistance through the Chenoa Fund "program" conceived by Respondent. Respondent was offering its own management services and know-how to a tribe, but not mortgage services to consumers thereof. This calls to mind what happened in *Lyons*, where "Lyons's interactions with the organizing committee were in the nature of 'proposing and planning the formation of a [VSO],' not 'providing the services herself.'" *Lyons*, 123 USPQ2d at 1026. *Lyons* is also similar to this case in that "the document Lyons cites as her first use of the mark, The Equine Excellence Initiative, was written in the future tense, indicating Lyons's *future* plans to form a VSO with the name of the mark … But we have held that mere preparation and publication of future plans do not constitute use in commerce." *Id.* at 1030.

that in *Lyons*, which affirmed the Board's finding that the public would not associate the mark with Lyons because she "engaged in at most 'de minimis' use of the mark, and … her use never rose to the level of use in commerce sufficient to 'create an association in the minds of the purchasing public' between Lyons and the mark." *Lyons*, 123 USPQ2d at 1029.

## C. To Whom the Public Looks to Stand Behind the Quality of the CHENOA FUND Mortgage Services

Again, only Petitioner uses the CHENOA FUND Mark for mortgage services; there is no evidence that Respondent does so. 18 TTABVUE 11, 30-31, 34-38, 203, 208-236, 241; 19 TTABVUE 600-890; 20 TTABVUE 3-273, 277-340. Therefore, there would be no reason for the public to look to Respondent to stand behind the quality of CHENOA FUND mortgage services, and every reason for the public to look instead to Petitioner to stand behind the quality of those services. *See Lyons*, 123 USPQ2d at 1030 (finding that the public would not look to Lyons for quality control because she "produced no evidence" that she offered the relevant services).

## V. Conclusion

Although Respondent "created" the CHENOA FUND Mark and "used" the term and accompanying logo in promotional materials targeted to tribes, it was not, and was not permitted to be, the first to use the mark in connection with mortgage services. Petitioner was the first to use the mark for mortgage services. In fact, there is no evidence that Respondent has ever used the CHENOA FUND Mark for mortgage services. Because Petitioner was the first and only user of the mark for mortgage services, the public perceives Petitioner as the source of CHENOA FUND

services. This is exactly how the parties drew it up in the MSA. Thus, Petitioner has established, by a preponderance of the evidence, that on the filing date of the application underlying Respondent's involved Registration, Respondent did not own the CHENOA FUND Mark and Respondent's application was thus void *ab initio*.[21] Trademark Rule 2.71(d), 37 C.F.R. 2.71(d).

**Decision:** The petition for cancellation is granted on the ground of non-ownership.[22]

---

[21] Because Petitioner owns the CHENOA FUND Mark for mortgage services, Respondent cannot establish that it "granted [Petitioner] license to use the Chenoa Fund Mark either orally and/or impliedly." 25 TTABVUE 32. Respondent could not license what it did not own. Tellingly, Respondent's argument that there was some type of license is unsupported by any probative evidence. *See id.* at 32-35.

[22] Because we have resolved this proceeding on Petitioner's non-ownership claim, we need not reach Petitioner's other claims. *Yazhong Inv. Ltd. v. Multi-Media Tech Ventures, Ltd.*, 126 USPQ2d 1526, 1540 (TTAB 2018); *Multisorb Tech., Inc. v. Pactiv Corp.*, 109 USPQ2d 1170, 1171 (TTAB 2013).